Matthew N. FRASER, a minor, and
E.L. Fraser, as his Guardian Ad
Litem, Plaintiffs-Appellees,

v.

BETHEL SCHOOL DISTRICT NO. 403,
Christy B. Ingle; David C. Rich; J.
Bruce Alexander; and Gerald E. Hos-
man, Defendants-Appellants.

Nos. 83–3987, 83–4142.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 7, 1984.

Decided March 4, 1985.

Eugene A. Wright, Circuit Judge, dis-
sented with opinion.

Jeffrey T. Haley, Simburg, Ketter, Haley, Sheppard & Purdy, Seattle, Wash., for plaintiffs-appellees.

William A. Coats, Clifford Foster, Jr., Kane, Vandeberg, Hartinger & Walker, Tacoma, Wash., for defendants-appellants.

Before WRIGHT, GOODWIN and NORRIS, Circuit Judges.

NORRIS, Circuit Judge:

Bethel School District appeals a judgment for declaratory and injunctive relief, damages, and $12,750 costs and attorney's fees in this civil rights action brought under 42 U.S.C. § 1983 by a student who claimed that the district had abridged his freedom of speech as protected by the First and Fourteenth Amendments. We affirm.

### I

On April 26, 1983, appellee Matthew N. Fraser, then a seventeen-year-old senior at Bethel High School in Tacoma, Washington, nominated a friend and classmate for school office at a student-run assembly called for that purpose. The following is the entire text of Fraser's nominating speech:

> I know a man who is firm—he's firm in his pants, he's firm in his shirt, his character is firm—but most of all, his belief in you, the students of Bethel is firm. Jeff Kuhlman is a man who takes his point and pounds it in. If necessary, he'll take an issue and nail it to the wall. He doesn't attack things in spurts—he drives hard, pushing and pushing until finally—he succeeds.
>
> Jeff is a man who will go to the very end—even the climax, for each and every one of you.
>
> So vote for Jeff for ASB vice-president—he'll never come between you and the best our high school can be.

The day after he delivered the speech, Fraser was asked to report to the assistant principal's office and to produce a copy of the text of his speech. At the meeting, Fraser was given notice that he was being charged with violating the school's disruptive conduct rule.[1] After he was given an opportunity to explain his conduct, he was suspended for three days. Fraser, who was a member of the Honor Society and the debate team and the recipient of the "Top Speaker" award in statewide debate championships for two consecutive years, was also informed that his name would be removed from a previously approved list of candidates on the ballot for graduation speaker. Even though his name was stricken from the ballot, he was elected a graduation speaker by his classmates on a write-in vote, receiving the second highest number of votes cast. The District, nevertheless, continued to deny him permission to speak.

---

1. The rule, which was published in the school's student handbook, states:

   In addition to the criminal acts defined above, the commission of, or participation in certain noncriminal activities or acts may lead to disciplinary action. Generally, these are acts which disrupt and interfere with the educational process.

   *Disruptive Conduct.* Conduct which materially and substantially interferes with the educational process is prohibited, including the use of obscene, profane language or gestures.

Fraser initiated a grievance of the disciplinary action by making a submission to the Superintendent of the Bethel School District. After the grievance was denied, Fraser, joined by his father as guardian ad litem, filed this civil rights action. After an evidentiary hearing at which the school principal, two assistant principals, several teachers and Fraser all testified, Judge Tanner issued a declaratory judgment that the School District violated Fraser's rights under the First and Fourteenth Amendments under the United States Constitution and the Civil Rights Act by subjecting him to a three-day suspension and removing his name from the list of candidates for the graduation speaker, and that the punishment imposed upon Fraser was null and void. Judge Tanner also enjoined the District from refusing to allow Fraser to participate in Bethel High School's commencement exercises as a graduation speaker and awarded Fraser $278 as damages and $12,750 as costs and attorney's fees. The District invokes our jurisdiction to hear its appeal under 28 U.S.C. § 1291.

Before addressing the District's arguments on appeal, we will review a few basic principles of First Amendment jurisprudence. It is well established that high school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Independent School District,* 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). It is also well established, however, that a student's First Amendment rights are not absolute; the limits of a student's right to express himself must be defined in light of the special characteristics of the school environment. *Id.* at 506, 89 S.Ct. at 736. As our Court said in *Nicholson v. Board of Education,* 682 F.2d 858 (9th Cir.1982), "In the high school setting, school officials and teachers must be accorded wide latitude over decisions affecting the manner in which they educate students." *Id.* at 863. The discretion of school authorities in managing school affairs is necessarily limited, however, by "the imperatives of the First Amendment." *Board of Education, Is-*

*land Trees Union Free School District v. Pico,* 457 U.S. 853, 864, 102 S.Ct. 2799, 2807, 73 L.Ed.2d 435 (1982) (plurality opinion). Under *Tinker* and its progeny, "school officials must bear the burden of demonstrating 'a reasonable basis for interference with student speech, and … courts will not rest content with officials' bare allegation that such a basis existed.'" *Trachtman v. Anker,* 563 F.2d 512, 517 (2d Cir.1977) quoting *Eisner v. Stamford Board of Education,* 440 F.2d 803, 810 (2d Cir.1971). *See also, Scoville v. Board of Education,* 425 F.2d 10, 13 (7th Cir.), *cert. denied,* 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970). Under our Constitution, it is the role of the judicial branch of government to resolve First Amendment controversies between students and public school officials such as the one between Matthew Fraser and the Bethel School District. A celebrated case in point is *West Virginia v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), where the Supreme Court was called upon to decide whether a public school student could be compelled to salute the flag. Ruling in favor of the student, the Court, speaking through Justice Jackson, said,

"The Fourteenth Amendment, as now applied to the states, protects the citizen against the state itself and all of its creatures—Boards of Education not excepted. These have, of course, important delicate and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights."

*Id.* at 637, 63 S.Ct. at 1185.

We must address three basic arguments made by the District in support of its claim on appeal that the disciplinary action did not abridge Fraser's constitutional rights: (1) The District may discipline Fraser because the nominating speech had a disruptive effect on the educational process of the school; (2) the District's interest in maintaining a level of civility at the school justified its disciplinary action against Fraser for using language which school officials consider to be indecent; and (3) the District

may discipline Fraser for using language considered to be objectionable because the speech was made at a school-sponsored function and was an extension of the school program. We will consider each argument in turn.[2]

## II

■ We agree with the District that the First Amendment does not prohibit school officials from disciplining a student who materially disrupts the educational process. As the Supreme Court said in *Tinker*, student speech or conduct is "not immunized by the constitutional guarantee of freedom of speech" if it "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." 393 U.S. at 513, 89 S.Ct. at 740.

*Tinker* involved three high school students who were suspended for continuing to wear black armbands as a symbolic protest against the war in Vietnam after being asked to remove them. The Supreme Court held that the suspension violated the students' First Amendment rights because the school district failed to establish that the black armbands had a disruptive effect on the operations of the school or that the school officials had reason to anticipate that the armbands would cause a disruption. The *Tinker* Court ruled that the students' constitutional right to protest the war by wearing black armbands could not be infringed because there were no "facts which might reasonably have led school authorities to forecast substantial disruption or material interference with school activities, and no disturbances or disorders on the school premises in fact occurred." *Id.* at 514, 89 S.Ct. at 740.

■ Just as in *Tinker*, the Bethel School District has failed to carry its burden of demonstrating that Fraser's use of sexual innuendo in the nominating speech substantially disrupted or materially interfered in any way with the educational process. In support of its contention that the speech was disruptive, the District cites the testimony of Gary McCutcheon, a school counselor who testified that some students at the assembly reacted to Fraser's speech with "hooting and yelling." Appellant's Brief at 3. Mr. McCutcheon testified as follows:

Q: Let's first go with what did you hear from the student body?

A: Not too dissimilar to what Mrs. Hicks just reported, the students were pockets of high volume conversations, hooting, yelling, which is not atypical to a high school auditorium assembly and the auditory, the sounds were not too dissimilar to any auditorium sounds I have heard over the many assemblies I have been at Bethel High School.

Q: Were there physical activities as well?

A: I think of particular interest might be perhaps was something I hadn't seen before. I had seen one student on the side of the bleachers where I was sitting actually simulate masturbation and two students on the opposite bleachers were simulating the sexual intercourse movement with hips.

Q: Can you show us what you mean?

A: I prefer not to.

Q: I will defer to that, was there any student reaction to all of this other than the ones that were hooting?

A. Student reaction to the three cases I mentioned?

---

**2.** The question whether Fraser's First Amendment rights were violated is a mixed question of law and fact since it requires us to apply principles of First Amendment jurisprudence to the specific facts of this case. The appropriate standard of review is de novo because, as we said in *United States v. McConney*, 728 F.2d 1195 (9th Cir.) (en banc), *cert. denied*, —— U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984), "the question requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles.... The predominance of factors favoring de novo review is even more striking when the mixed question implicates constitutional rights." *Id.* at 1202–03.

Q: Some students were hooting and some students were acting out, were all of the students doing that?

A: No, one student in the first case and two students in the opposite bleachers in the second case. That is the only three I noticed that were doing anything that was different. .

Q: Did you note any student reaction to this conduct?

A: I think—gee, I can't pinpoint it, I say in general a couple of students around that particular three individuals were getting more aroused volume wise with their voice, I would say.

That testimony is the only evidence that the District cites in its brief in support of its contention that Fraser's speech disrupted the assembly.

The record also contains the testimony of Irene Hicks, a teacher who also heard the speech. She described the student reaction as follows:

A: The best way to describe it, I think, is mixed. There were pockets of loud clapping, hoots and hollering and then there were other students that were sitting there, I guess my best words to describe it is as rather bewildered, not understanding what the kids were clapping about and why there was such a difference in reception to the speech.

      .      .      .      .      .

A: The kids were, as I said, some were just kind of bewildered and the others were just saying, yahoo, wonderful, we are all for it, great.

Thus, what the evidence demonstrates is that Fraser's speech evoked a lively and noisy response from the students, including applause, and that a few of the students reacted with sexually suggestive movements. The administration had no difficulty in maintaining order during the assembly and Fraser's speech did not delay the assembly program. Fraser was the second to last speaker, followed by his candidate, Jeff Kuhlman, who then made the final speech of the afternoon without incident. The assembly, which took place after the last school class of the day, was dismissed on schedule.

The only other evidence cited by the District to support its claim that the speech was disruptive of the educational process is the testimony of Debbie Carmandi, a home economics teacher, who said that during class the next day the students expressed so much interest in Fraser's speech that she devoted approximately ten minutes to a discussion of it. Judge Tanner summarized her testimony as follows: "On the day after the speech was delivered, a teacher found that students in her class were more interested in discussing the speech than attending to class work. The teacher then invited a class discussion of the speech." Finding of Fact No. 5.

Given the evidence before us, we fail to see how we can distinguish this case from *Tinker* on the issue of disruption. Just as the record in *Tinker* failed to yield evidence that the wearing of black armbands resulted in a material interference with school activity, the record now before us yields no evidence that Fraser's use of a sexual innuendo in his speech materially interfered with activities at Bethel High School. While the students' reaction to Fraser's speech may fairly be characterized as boisterous, it was hardly disruptive of the educational process. In the words of Mr. McCutcheon, the school counselor whose testimony the District relies upon, the reaction of the student body "was not atypical to a high school auditorium assembly." In our view, a noisy response to the speech and sexually suggestive movements by three students in a crowd of 600 fail to rise to the level of a material interference with the educational process that justifies impinging upon Fraser's First Amendment right to express himself freely.

We find it significant that although four teachers delivered written statements to an assistant principal commenting on Fraser's speech, none of them suggested that the speech disrupted the assembly or otherwise

interfered with school activities.[3] *See* Finding of Fact No. 8. Nor can a finding of material disruption be based upon the evidence that the speech proved to be a lively topic of conversation among students the following day.

We recognize that the principal, assistant principals and some teachers thought that Fraser's speech was inappropriate for a school assembly because of what they considered to be sexually explicit language.[4] In response to questioning by Judge Tanner, both the principal, David Rich, and the assistant principal, Lee Morrison, testified that in their view the word "inappropriate" was synonymous with the word "disruptive" in the school context. The mere fact that some members of the school community considered Fraser's speech to be inappropriate does not necessarily mean it was disruptive of the educational process. The First Amendment standard *Tinker* requires us to apply is material disruption, not inappropriateness. As the Supreme Court said in *Tinker*,

> Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, *Terminiello v. Chicago*, 337 U.S. 1 [69 S.Ct. 894, 93 L.Ed. 1131] (1949); and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow

up and live in this relatively permissive, often disputatious, society.

393 U.S. at 508, 89 S.Ct. at 737. Thus, we conclude that the District has failed to demonstrate that the speech had a materially disruptive effect on the educational process.

### III

The District's second major argument is that regardless whether the speech was disruptive, it is not prohibited by the First Amendment from disciplining Fraser for using sexual references which, in the opinion of school officials, made the speech "indecent." [5] The thrust of this argument is that school officials have a legitimate interest in protecting teachers and students from speech deemed to be offensive and that this interest outweighs Fraser's interest in using sexual innuendo in his speech. In making this argument, the District relies heavily on *Federal Communications Commission v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), and the concurring opinion of Judge Newman in *Thomas v. Board of Education*, 607 F.2d 1043 (2d Cir.1979).

In *Pacifica*, the Supreme Court held that the First Amendment did not prohibit the Federal Communications Commission from regulating a radio broadcast that the Commission and a majority of the Court deemed to be indecent, although not obscene. Specifically, the Court upheld a Commission order declaring that a radio broadcast of George Carlin's "Filthy Words" monologue was indecent within the meaning of 18

---

**3.** Three of the teachers disapproved of the speech as "inappropriate" for a high school assembly. The fourth found nothing offensive about it.

**4.** There is no evidence in the record indicating that any students found the speech to be offensive. Fraser was the only student to testify.

**5.** It is well settled that speech that is legally obscene does not qualify for First Amendment protection. *See Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). The District does not contend, however, that Fraser's speech was obscene. To decide whether an

expression is obscene, a trier of fact determines "(a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest ...; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973) (citations omitted).

U.S.C. § 1464.[6] In upholding the Commission's order against constitutional attack, the Supreme Court emphasized that of all forms of communication, broadcasting has received the most limited First Amendment protection for two principal reasons: (1) broadcasting intrudes directly on the privacy of an unwilling listener while he or she is at home, 438 U.S. at 748, 98 S.Ct. at 3039; and (2) broadcasting is uniquely available to unsupervised children, even those too young to read. *Id.* at 749, 98 S.Ct. at 3040.

In *Thomas*, 607 F.2d 1043 (2d Cir.1979), the Second Circuit held that the First Amendment rendered school officials powerless to discipline students for publishing an *off*-campus newspaper specializing in sexual satire. Because the students' *on*-campus activity in publishing and distributing the newspaper was de minimis, the majority in *Thomas* did not reach the question whether the students could have been punished for distributing the newspaper on campus. *Id.* at 1050. That question, however, was discussed by Judge Newman in his separate concurring opinion. *Id.* at 1053. The District argues that we should adopt the view expressed by Judge Newman that the doctrine of *Pacifica* should be extended to the high school context.[7] Relying upon *Pacifica*, Judge Newman reasoned, "If the F.C.C. can act to keep indecent language off the afternoon airwaves, a school can act to keep indecent language from circulating on high school grounds." *Id.* at 1057.

Thus, we are asked by the District to expand the doctrine of *Pacifica* beyond the context of broadcasting to the high school environment. We believe the relevant inquiry is whether the Supreme Court's rationales for sanctioning government regulation of "indecent" speech in broadcasting are applicable to a high school assembly convened for the express purpose of providing a forum for students to make campaign speeches.

The Supreme Court's first rationale in *Pacifica*—that broadcasting can be very intrusive upon the privacy of the home—is plainly inapplicable to a high school assembly. High school students voluntarily attending an assembly to hear student campaign speeches surely do not expect the same measure of privacy and protection from unwelcome language and ideas that they obviously do at home. A high school assembly is a very public place. In contrast, the Constitution treats homes as special sanctuaries for privacy. As the Supreme Court said in *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971): [8]

"While this Court has recognized that government may properly act in many situations to prohibit intrusion into the privacy of the home of unwelcome views and ideas which cannot be totally banned from the public dialogue ..., we have at the same time consistently stressed that we are often 'captives' outside the sanctuary of the home and subject to objectionable speech."

*Id.* at 21, 91 S.Ct. at 1786 (citations omitted).

The Supreme Court's second rationale in *Pacifica*—that broadcasting routinely reaches impressionable young children—is also inapplicable to a high school assembly.

---

**6.** 18 U.S.C. § 1464 provides, "Whoever utters any obscene, indecent, or profane language by means of radio communication shall be fined not more than $10,000 or imprisoned not more than two years, or both."

**7.** Judge Kaufmann, writing for the court in *Thomas*, disagreed with Judge Newman that the issue of on-campus distribution of the newspaper was before the court. Judge Kaufmann, nevertheless, questioned the soundness of Judge Newman's view on the issue of on-campus distribution: "We would hesitate, however, to conclude that the obvious need for a flexible application of the First Amendment in the school setting allows educational officials free-wheeling and unbridled discretion to prohibit expression they regard as indecent, even within the narrow confines of the schoolhouse." *Id.* at 1052 n. 18.

**8.** The Supreme Court held in *Cohen* that under the First Amendment a state could not make it a criminal offense to wear a jacket bearing the words "Fuck the Draft" in a courthouse. 403 U.S. at 26, 91 S.Ct. at 1788.

Fraser was not talking to children too young to read; he was speaking to young adults, many of whom as high school seniors on the eve of graduation would have already reached voting age. Realistically, high school students are beyond the point of being sheltered from the potpourri of sights and sounds we encounter at every turn in our daily lives. Although we may be offended by some of what we see and hear, that is a price we must pay for the privilege of living in a free and open pluralistic society.

Thus, we hold that the rationales of *Pacifica* have no applicability to the high school environment, especially to an assembly convened for student political speech-making. It is one thing to apply a standard of "indecency" to restrict the First Amendment protection of broadcasting out of concern for the privacy of the home and impressionable young children; it would be quite another to give school officials discretion to apply the amorphous standard of "indecency" to restrict the First Amendment freedoms of high school seniors' making campaign speeches for student office. We fear that if school officials had the unbridled discretion to apply a standard as subjective and elusive as "indecency" in controlling the speech of high school students, it would increase the risk of cementing white, middle-class standards for determining what is acceptable and proper speech and behavior in our public schools. Language that may be considered "indecent" in one segment of our heterogeneous society may be common, household usage in another. Freedom to be different in our individual manner of expression is a core constitutional value; the First Amendment reflects the considered judgment of our Founding Fathers that government offi-

cials, including public school administrators and, for that matter, judges, should not be permitted to use their power to control individual self-expression.

Matthew Fraser testified that he knowingly used "sexual innuendo" in his speech nominating Jeff Kuhlman for school office. As Judge Tanner found, Fraser did so because he thought it would be effective to establish a rapport with his fellow students, and perhaps to amuse them. Whether he succeeded or whether he went over the line of good taste and became offensive is for his fellow students to judge when they cast their ballots in the school elections.[9] Thus, we decline to expand the doctrine of *Pacifica* to give public school officials power to regulate the speech of high school students they consider to be indecent.[10] Accordingly, we hold that the First Amendment prohibited the District from punishing Fraser for making a speech that school officials considered to be "indecent."

## IV

In addition to relying on *Pacifica* and Judge Newman's concurring opinion in *Thomas*, the District cites a number of other cases as authority for the general proposition that school officials may control the language used to convey ideas at school-sponsored events.[11] In essence, the District argues that because school officials can control the agenda and subject matter of school-sponsored assemblies, they can regulate the speech of students who participate in the assemblies and can punish students for language that they find objectionable.

That school officials have broad discretion to control the content of the school

9. Fraser's candidate went on to win the election.

10. We need not reach the question whether a school board may refuse to make books or other instructional materials available to students because they contain language deemed to be offensive. *See Board of Education, Island Trees Union Free School District v. Pico,* 457 U.S. 853, 880, 102 S.Ct. 2799, 2815, 73 L.Ed.2d 435 (1982) (Blackmun, J., concurring).

11. In support of its contention that the assembly was sponsored by the school, the District argues that the student body election for which Fraser was giving his speech is a "formal organization of the students of the school formed with the approval of and regulation by the board of directors of the school district...." Wash.Rev. Code § 28A.58.115.

curriculum cannot be disputed. *See Nicholson v. Board of Education*, 682 F.2d 858, 863 (9th Cir.1982). Although Fraser delivered his speech to a school-sponsored assembly, his speech was clearly not part of the school curriculum. The assembly, which was run by a student, was a voluntary activity in which students were invited to give their own speeches, not speeches prescribed by school authorities as part of the educational program. Attendance, moreover, was not compulsory; students were free to attend a study hall instead.

Because this case does not involve the compulsory environment of the classroom, we find the District's reliance on *Board of Education, Island Trees Union Free School District v. Pico*, 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982), to be puzzling. In *Island Trees*, the Supreme Court held that a local school board's discretion to determine the content of its school libraries is limited by the imperatives of the First Amendment. The Court remanded the case for trial to determine the reasons behind the school board's removal of certain books from the library because "local school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *Id.* at 872, 102 S.Ct. at 2810 (quoting *West Virginia Board of Education v. Barnette*, 319 U.S. at 642, 63 S.Ct. at 1187). The Bethel School District's reliance on *Island Trees* is clearly misplaced because, as Justice Brennan said speaking for the plurality, school boards may not "extend their claim of absolute discretion beyond the compulsory environment of the classroom, into the school library and the regime of voluntary inquiry that there holds sway." *Id.* 457 U.S. at 869, 102 S.Ct. at 2809. A voluntary student election assembly is even further removed from the "compulsory environment of the classroom" than a library. Similarly, in *Bicknell v. Vergennes Union High School Board of Directors*, 638 F.2d 438 (2d Cir.1980), also relied upon by the school

district, the court recognized that the First Amendment imposes fewer restrictions on a school board's discretion to choose materials for the school program than to regulate a student's right of expression. *Id.* at 441 n. 3.

The case before us is also distinguishable from *Nicholson*, where we held that students in a journalism class that publishes a school newspaper do not have a constitutional right to be free from prepublication review by the school principal. 682 F.2d at 863. *Nicholson* did involve the compulsory environment of the classroom. The publication of the newspaper was part of a journalism class in which students were being taught how to be journalists. As we explained, "[T]he school possessed a substantial educational interest in teaching young, student writers journalistic skills which stressed accuracy and fairness." *Id.* Indeed, in *Nicholson* we explicitly pointed out that school officials had much greater latitude in reviewing a student publication that was part of the curriculum than in the case of a student newspaper that was an extra-curricular activity. In the latter case, we said that such "outright censoring or prohibition would require a strong showing on the part of school administrators that publication of that forbidden materials would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school.'" *Id.* at 863 n. 3 (quoting *Tinker*, 393 U.S. at 509, 89 S.Ct. at 738).

■ The voluntary, student-run assembly which Fraser addressed was clearly an extra-curricular activity, not part of the school curriculum. The assembly was in the best sense a student activity; the candidates and their nominators were on their own, free to exercise their individual judgments about the content of their speeches. In exercising his First Amendment rights at the assembly, Fraser was as free to express himself as if the students had organized a campaign rally in the cafeteria or outside on the school steps. *See Tinker*, 393 U.S. at 512–13, 89 S.Ct. at 739–40 ("When [a student] is in the cafeteria, or on

the playing field, or on the campus during the authorized hours, he may express his opinions, even on controversial subjects like conflict in Vietnam....").

The other cases cited by the District are also inapposite. In *Seyfried v. Walton*, 668 F.2d 214 (3d Cir.1981), for example, the Third Circuit explicitly distinguished the superintendent's permissible decision to cancel a drama class' production of "Pippin" from the constitutionally impermissible censoring of "non-program related expressions of student opinion." *Id.* at 216. The District's reliance on *Trachtman v. Anker*, 563 F.2d 512 (2d Cir.1977), where school officials restrained students' efforts to distribute a sex questionnaire, is also misplaced. The narrow question before the Second Circuit was whether the school officials made an adequate showing to justify their prohibition of the distribution of the questionnaire. The court held that the record established a substantial basis for defendants' belief that distribution of the questionnaire would result in emotional harm to students. *Id.* at 520. There simply has been no such showing here.

When Fraser delivered his nominating speech to fellow students who were assembled for the explicit purpose of exchanging ideas and information about candidates for school office, he spoke under the protective cloak of the First Amendment. As the Supreme Court said in *Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967):

> " 'The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.' *Shelton v. Tucker*, [364 U.S. 479] at 487 [81 S.Ct. 247 at 251, 5 L.Ed.2d 231 (1960)]. The classroom is peculiarly the 'marketplace of ideas.' The Nation's future depends upon leaders trained through wide exposure to that robust

exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection.' "

*Id.* at 603, 87 S.Ct. at 683. Just as in the political world outside the school, the First Amendment requires that the principal restraint on the choice of words and ideas in political dialogue is the risk of disapproval by the audience the speaker hopes to influence.

To their credit, Bethel High School officials created an open forum for students to express their political views; when they did so, they implicated the fundamental right of participation in the process of self-government, albeit a student government. The school officials are to be commended for giving the students an opportunity to gain practical experience in the democratic process. That is exactly what Fraser was doing. He made a personal judgment when he chose to use sexual innuendo in his speech. It may have been politically risky to do so, but the decision was his and his alone to make. As long as the speech was neither obscene nor disruptive, the First Amendment protects him from punishment by school officials. As Justice Jackson said, "That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *West Virginia v. Barnette*, 319 U.S. at 637, 63 S.Ct. at 1185. In conclusion, we hold that the District violated Fraser's First Amendment rights when it disciplined him for the language and verbal imagery he used in nominating his candidate for office.[12]

The declaratory judgment and the award of attorney's fees and costs are AFFIRMED. Because the injunction served

---

12. It follows from our First Amendment analysis that we must also affirm Judge Tanner's declaration that the school's misconduct rule is constitutionally infirm, because on its face it permits a student to be disciplined for using speech considered to be "indecent" even when engaged in an extra-curricular activity. *See* in-

fra note 1. Because we decide the case on First Amendment grounds, we need not review Judge Tanner's ruling that the District's action in removing Fraser's name as a graduation speaker violated his Fourteenth Amendment right to due process of law.

its purpose of assuring that Fraser qualified as a commencement speaker, it is VACATED as moot.[13]

EUGENE A. WRIGHT, dissenting:

The court holds today that school authorities are powerless to discipline a student who makes a crude and sexually suggestive speech during a school assembly. It further holds that the authorities had no choice but to allow the same student to address an audience of children, parents, and distinguished community members in the school commencement exercises.

I dissent because the majority improperly usurps the authority of school officials to maintain and enforce minimum standards of decency in public schools. The court ignores the "delicate accommodation" necessary to insure that First Amendment freedoms coexist with institutional needs. *Thomas v. Board of Education,* 607 F.2d 1043, 1049 (2d Cir.1979), *cert. denied,* 444 U.S. 1081, 100 S.Ct. 1034, 62 L.Ed.2d 765 (1980), *on remand,* 505 F.Supp. 102 (N.D. N.Y.1981). Further, it misunderstands and misapplies *Tinker*'s "substantial disruption" standard in the context of indecent expression.

The facts are recounted in the majority's opinion. I add a few details to bring the majority's mistakes into sharper focus.

Fraser was a 17-year-old senior at Bethel High School when the incidents underlying this action occurred. The school is in Spanaway, Washington, a suburban community close to Tacoma. The community also is home to Pacific Lutheran University, a small, private university. Bethel High School is the only senior high school within the jurisdiction of defendant Bethel School District No. 403. The events occurring there understandably engage the full attention of the local school board.

Fraser gave his speech during an assembly in the school auditorium. It was held during school hours and was attended by over 600 students and teachers. Attendance at the assembly was mandatory unless students preferred to study in the study hall. The assembly and the student elections associated with it were part of the official school curriculum, designed to teach rhetoric and leadership.

Fraser's speech used deliberate sexual innuendo in an effort to shock and excite his audience. It received its intended response. Students reacted with hooting and yelling. One student was observed simulating masturbation. Others simulated intercourse. Teachers noted that some students were shocked and embarrassed.

The following day, several teachers complained to the principal that the speech was inappropriate in a school assembly. Several also complained that their classes were disrupted the day following the speech because of heated student reaction.

This court should begin with a presumption against judicial involvement in the schools. "[C]ourts should not 'intervene in the resolution of conflicts which arise in the daily operation of school systems' unless 'basic constitutional values' are 'directly and sharply implicate[d]' in those conflicts." *Board of Education, Island Trees Union Free School District No. 26 v. Pico,* 457 U.S. 853, 868, 102 S.Ct. 2799, 2808, 73 L.Ed.2d 435 (1982) (quoting *Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968)). *See also Nicholson v. Board of Education,* 682 F.2d 858, 863 (9th Cir.1982).

Of course, neither "students [n]or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines School District,* 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). Nevertheless, courts have largely recognized that schools are different from other public forums. Speech that would be protected on the street corner does not automatically deserve protection in the classroom or auditorium. *Bender v. Williamsport Area School District,* 741 F.2d 538, 560 (3rd Cir.1984) (free speech right of students dra-

---

**13.** Fraser delivered a graduation speech without incident.

matically different than the right to communicate in a traditional public forum).

As one commentator notes, "[t]he school environment is unique due to its physically confining nature, the immaturity of its population, and the special demands and needs of the educational purpose." Haskell, Student Expression in the Public Schools: *Tinker* Distinguished, 59 Geo.L.J. 37, 57–58 (1970). *See also* Diamond, The First Amendment and Public Schools: The Case Against Judicial Intervention, 59 Tex.L. Rev. 477, 496–510 (1981). The factors that make schools unique for First Amendment purposes are all relevant here. The majority erred in failing to address them.

The first difference is the physically confining nature of schools. The Supreme Court has noted on several occasions that government may protect a captive audience from being unwilling auditors of offensive speech, at least in those places that we consider sanctuaries. *Federal Communications Commission v. Pacifica Foundation,* 438 U.S. 726, 748–49 & n. 27, 98 S.Ct. 3026, 3039–40 & n. 27, 57 L.Ed.2d 1073 (1978); *id.* at 759, 98 S.Ct. at 3045 (Powell, J., concurring); *Rowan v. United States Post Office Dept.,* 397 U.S. 728, 736–38, 90 S.Ct. 1484, 1490–91, 25 L.Ed.2d 736 (1970). The captive audience problems were magnified here, because school rules required students to attend the assembly or study halls. Students had no ability to walk away from the offending speech. *Cf. Erznoznik v. Jacksonville,* 422 U.S. 205, 209, 95 S.Ct. 2268, 2272, 45 L.Ed.2d 125 (1975). Nor did they have any indication that speeches containing sexual innuendo would take place.

Second, it is constitutionally significant that Fraser's speech was made by a minor to other minors. While children clearly have some First Amendment rights, these rights differ in important respects from the rights enjoyed by adults. *See generally,* Garvey, Children and the First Amendment, 57 Tex.L.Rev. 321 (1979). As the Supreme Court noted, " '[t]he world of children is not strictly part of the adult realm of free expression. The factor of immatu-

rity, and perhaps other considerations, impose different rules.' " *Ginsberg v. New York,* 390 U.S. 629, 638 n. 6, 88 S.Ct. 1274, 1280 n. 6, 20 L.Ed.2d 195 (1968) (quoting Emerson, Toward a General Theory of the First Amendment, 72 Yale L.J. 877, 938, 939 (1963)). At home, parents are allowed to impose considerable restraints on their children's rights to "free expression." At school, the school authorities stand *in loco parentis* to enforce minimum standards of expression. *See New Jersey v. T.L.O.,* —— U.S. ——, 105 S.Ct. 733, 741, 83 L.Ed.2d 720 (1985) (reasonableness standard governs school searches).

Similarly, schools may act to protect the children from obscene or indecent language. The courts have consistently held that greater limits may be imposed on expression aimed at children than would be allowable for communication aimed at adults. *F.C.C. v. Pacifica Foundation,* 438 U.S. at 749, 98 S.Ct. at 3040; *Ginsberg v. New York,* 390 U.S. at 638–40, 88 S.Ct. at 1279–81. Here, Fraser's audience was primarily composed of minors. The school authorities had a substantial interest in protecting them from expression which could be shocking, embarrassing or detrimental at their stage of development. The school authorities were in the better position to determine whether the speech was harmful to other minors. Here, they concluded that Fraser's speech was disruptive and harmful. We should not lightly question that judgment.

Finally, schools perform a special function in our society. They are entrusted with the difficult task of educating children and preparing them for full participation in adult society. In addition to transmitting necessary information and techniques of learning to the students, we expect schools to instill citizenship, discipline, and acceptable morals. In short, we expect schools to inculcate society's values and help children become fully adjusted adults. *See Board of Education v. Pico,* 457 U.S. 853, 864, 102 S.Ct. 2799, 2806, 73 L.Ed.2d 435 (1982)

(Brennan, J. for the plurality); Diamond, *supra* at 498–99.

> As the Supreme Court recently noted, Today's public school officials do not merely exercise authority voluntarily conferred on them by individual parents; rather they act in furtherance of publicly mandated educational and disciplinary policies.

*New Jersey v. T.L.O.*, 105 S.Ct. at 741.

Given the special nature of the high school environment, school authorities have a right and a duty to condemn language that falls below the minimum standards of decency expected in the local community. "[W]hether a school condemns or tolerates indecent language within its sphere of authority will have significance for the future of that school and of its students." *Thomas v. Board of Education*, 607 F.2d at 1057 (Newman, J., concurring).

> In determining where school authorities may draw the line [regarding obscenity, vulgarity and indecency], courts must consider not only the fact that teen-age children are involved, but also the fact that the school is a special-purpose environment existing under peculiar sociological conditions.... It follows that a substantial degree of social propriety is called for in the operation of an effective educational system. *It might even be said ... that discouragement of the use of obscene or profane language is a function of the school.*

Haskell, *supra* at 56 (emphasis added).

In addition to the important function of schools in transmitting our culture's values, we must consider the tradition of judicial deference to the discretion of local school authorities in the management of school affairs. *See generally, Board of Education v. Pico*, 457 U.S. at 863–64, 102 S.Ct. at 2806–07; *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 42, 93 S.Ct. 1278, 1301, 36 L.Ed.2d 16 (1973).

To the extent that schools are expected to transmit society's values, local school boards are in the better position to determine what these values are. *See* Diamond,

*supra* at 509. Specifically, the community should have great leeway to define for itself the standards of decency expected in its schools. *See* Haskell, *supra* at 58.

School officials have wide latitude to balance free speech rights against the school's interest in avoiding endorsement of certain expression. *Seyfried v. Walton*, 668 F.2d 214, 216 (3rd Cir.1981) (officials may censor school play). The assembly at which Fraser spoke was conducted during school hours, on school property, and students were required to attend the assembly or a study hall. As a matter of state law, the "associated student body" election for which Fraser's campaign speech was given was a "formal organization of the students of the school formed with the approval of and regulation by the board of directors of the school district." Wash.Rev.Code Ann. § 28A.58.115. The school assembly, therefore, was a school district sponsored function that implied district endorsement of the students' activities.

The majority assumes that indecent language in a school can be prohibited only if it is legally obscene or likely to cause a "substantial disruption" under *Tinker*. Nothing in *Tinker*, however, "suggests that school regulation of indecent language must satisfy the criterion of a predictable disruption." *Thomas v. Board of Education*, 607 F.2d at 1055 (Newman, J., concurring). *See also* Haskell, *supra* at 49. (*Tinker* inapplicable to obscene and profane speech.)

*Tinker* concerned regulation of pure political speech. The speech there, black arm bands to protest the Vietnam war, concerned a political matter towards which we expect our schools to remain neutral. In that context, the Court held that the school could only regulate this expression if it could predict "substantial disruption" of the educational environment. *Tinker*, 393 U.S. at 514, 89 S.Ct. at 740.

This rationale is inapplicable to a school regulation which prescribes only the indecent manner in which an idea is expressed. *Thomas v. Board of Education*, 607 F.2d

at 1055–57 (Newman, J., concurring). The Supreme Court has indicated on several occasions that government may regulate the time and place where ideas are expressed in an indecent or offensive manner. In *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), the Court held that a state could not permissibly convict an adult simply for using a four-letter word. It indicated, however, that indecent speech could be prohibited in certain times and places. *Id.* at 19, 22, 91 S.Ct. at 1785, 1787.

The Court extended this rationale in *F.C.C. v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), when it held that the FCC could limit the broadcast of offensive language to times when children would be unlikely to be exposed to it. Justice Stevens, writing for the plurality, noted that government had less authority to regulate "a point of view" than to regulate "the way in which it is expressed." *Id.* at 746 n. 22, 98 S.Ct. at 3038 n. 22. He stated:

A requirement that indecent language be avoided will have its primary effect on the form, rather than the content, of serious communication. There are few, if any, thoughts that cannot be expressed by the use of less offensive language.

*Id.* at 743 n. 18, 98 S.Ct. at 3037 n. 18.

The *Pacifica* plurality relied on a nuisance rationale to hold that the F.C.C. could regulate the time and context of offensive broadcasts. *Id.* at 750, 98 S.Ct. at 3041. It noted that indecent speech " 'may be merely the right thing in the wrong place,—like a pig in the parlor instead of the barnyard.' " *Id.* (quoting *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 388, 47 S.Ct. 114, 118, 71 L.Ed. 303 (1926)).

Finally, the Court made a similar distinction between ideas and the manner in which they are expressed in *Board of Education v. Pico,* 457 U.S. at 871, 102 S.Ct. at 2810. In *Pico,* the Court held that whether a school district could remove books from its library depends upon the motivation involved. It stated, "[i]f petitioners *intended* ... to deny respondents access to ideas with which petitioners disagreed, and if this intent was the decisive factor in petitioner's decision, then petitioners have exercised their discretion in violation of the Constitution." *Id.* The Court noted, however, that it would be constitutional to remove books because they were "pervasively vulgar" or they were not educationally suitable. *Id.; see also id.* at 880, 102 S.Ct. at 2815 (Blackmun, J., concurring).

If indecent language may be regulated anywhere, it surely may be regulated in the schools. I would hold that school authorities may prohibit indecent and vulgar speech regardless of whether it satisfies *Tinker*'s "substantial disruption" standard.

Even if the *Tinker* standard applies, the majority errs in taking an overly constrained view of what constitutes "substantial disruption." This standard is flexible, *Karp v. Becken,* 477 F.2d 171, 174 (9th Cir.1973), and should be viewed in light of the delicate environment necessary to sustain learning. *Id.* at 175. "[B]ecause of the state's interest in education, the level of disturbance to justify official intervention is relatively lower in a public school than it might be on a street corner." *Id.; see Thomas v. Board of Education,* 607 F.2d at 1053 n. 18.

Courts should not be eager to substitute their judgment regarding what is disruptive for that of the school authorities. Substantial disruption to the educational environment may result from speech or conduct that appears harmless to the outside observer.

"[T]he proper functioning of the school is not, except at its gross extremes, an objectively ascertainable phenomenon." Diamond, *supra* at 497. A speech which causes great distraction, excitement or embarrassment among the students may disrupt the educational process as greatly as one which results in fist-fights.

The sensitive nature of the learning process calls for great deference by courts to the judgment of teachers and administration. "[I]n the public school context, per-

haps no one, but certainly not the judiciary, can readily ascertain the mental or emotional state that is necessary, appropriate, or desirable for learning to take place." *Id.* at 486.

Here, the school authorities found that Fraser's speech greatly impeded the daily business of education. They produced testimony substantiating their claim that Fraser's speech was sexually harassing and demeaning to female students. They concluded that the speech was both disruptive and potentially harmful to the learning process. We should not be quick to second-guess that judgment.

I disagree further with the majority's cursory affirmance of the district court's holding that Bethel High School's disruptive conduct rule is unconstitutionally vague and overbroad. School district rules are not held to the same due process standards for vagueness and overbreadth as criminal statutes. *Black Coalition v. Portland School District No. 1,* 484 F.2d 1040, 1044 (9th Cir.1973); *Esteban v. Central Missouri State College,* 415 F.2d 1077, 1087–89 (8th Cir.1969), *cert. denied,* 398 U.S. 965, 90 S.Ct. 2169, 26 L.Ed.2d 548 (1970).

Bethel High School's disruptive conduct rule was drafted specifically for the school environment. "Given this 'particular context,' the ordinance gives 'fair notice to those to whom [it] is directed.'" *Grayned v. City of Rockford,* 408 U.S. 104, 112, 92 S.Ct. 2294, 2301, 33 L.Ed.2d 222 (1972).

Because school conduct rules cannot be drawn with the same precision as criminal statutes, some discretion must be left to school officials to decide what actions should be sanctioned. *Murray v. West Baton Rouge Parish School Board,* 472 F.2d 438, 442 (5th Cir.1973).

As the Supreme Court recognized in *New Jersey v. T.L.O.,* school disciplinary rules must be flexible to enable school officials to maintain an environment in which learning can take place.

> [T]he preservation of order and a proper educational environment requires close supervision of schoolchildren, as well as

enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult. 'Events calling for discipline are frequent occurrences and sometimes require immediate, effective action.' ... Accordingly, we have recognized that maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures....

105 S.Ct. at 742–43 (citations omitted).

The discretion accorded school officials is limited when the school's disruptive conduct rule is used to infringe First Amendment rights. *Hall v. Board of School Commissioners,* 681 F.2d 965, 968 (5th Cir. 1982); *Murray,* 472 F.2d at 442. Here, however, Fraser's speech was not constitutionally protected. This court should defer to the school board's proper exercise of discretion.

Under the standards enunciated in *Black Coalition,* Bethel High School's disruptive conduct rule is neither vague nor overbroad. I would reverse the declaratory judgment and the award of attorney's fees and costs.