795 F.2d 1368
 55 USLW 2047, 33 Ed. Law Rep. 1021
 Cathy KUHLMEIER; Leslie Smart; Lee Ann Tippett, Appellants,
v.
HAZELWOOD SCHOOL DISTRICT; Charles Sweeney; Joseph
Donahue; Gwen Gerhardt; August Busch, Jr.; Ann Gibbson;
James Arnac; Dr. Thomas Lawson; Robert Eugene Reynolds;
Howard Emerson; Dr. Francis Huss, Appellees.
Student Press Law Center and Journalism Education
Association, Amici curiae, for appellants
St. Louis Globe-Democrat, Inc., Amicus curiae.
 No. 85 1614.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 16, 1986.
Decided July 7, 1986.
Rehearing and Rehearing En Banc Denied Aug. 27, 1986.
 
 Leslie D. Edwards and Frank Susman, St. Louis, Mo., for appellants.
 Robert P. Baine, Jr., Clayton, Mo., for appellees.
 Before HEANEY, ARNOLD, and WOLLMAN, Circuit Judges.
 HEANEY, Circuit Judge.
 
 
 1
 The issue in this appeal is whether administrators of Hazelwood East High School violated the first amendment rights of the student staff of the school newspaper, Spectrum, by deleting two full pages of the May 13, 1983, edition because they objected to the content of two of the articles on these pages. We hold that Spectrum is a public forum for the expression of student opinion and that the two articles objected to by the administrators could not reasonably have been forecast to materially disrupt classwork, give rise to substantial disorder, or invade the rights of others. Accordingly, we hold that the deletion of the two pages violated the first amendment rights of the student staff. We reverse and remand to the district court with directions to determine whether nominal damages should be awarded to the plaintiffs and, if so, the amount.
 
 BACKGROUND
 
 2
 Appellants are three former Hazelwood East High School students who were staff members of Spectrum. Appellees are the Hazelwood School District, the Hazelwood school principal, the school superintendent, and the assistant superintendent.
 
 
 3
 Spectrum is the school newspaper at Hazelwood East. Produced by the Journalism II class, it is published eight to ten times each year. Student staff members determine the content and layout of the paper. During the spring semester of the 1982-83 school year, Robert Stergos taught Journalism II and served as Spectrum's faculty advisor. Although Stergos exercised minimal editorial control, he submitted each issue of Spectrum to Principal Robert Reynolds for prepublication review. Stergos approved of the articles to be published in the May 13, 1983 edition, in near final form, before he left the school district's employ on April 29, 1983.
 
 
 4
 Stergos' replacement, Howard Emerson, took the laid-out May 13 edition of Spectrum to the printers on May 6, 1983. He received the proofs back on May 10, and delivered them to Reynolds for approval. Reynolds directed Emerson to delete two full pages containing five articles, only two of which he found objectionable.[1] Reynolds objected to one story which chronicled three Hazelwood East students' experiences with pregnancy, and another which discussed the impact of divorce on children. Reynolds gave Emerson no reason for the deletions.
 
 
 5
 Although pseudonyms were used for the girls in the pregnancy study, Reynolds subsequently testified that he thought they could be identified from the text. He was concerned with the divorce article because one student was named and gave reasons for her parents' divorce. He thought this inappropriate for publication because the parents had not consented, and were not given an opportunity to respond. Reynolds was unaware of the fact that Emerson had deleted the student's name from the copy of the article which was to be sent to the printer.
 
 
 6
 Reynolds did not inform the student authors of his decision; they learned of the deletions when the paper was released on May 13, 1983. They met with Reynolds that afternoon to discuss the deletions, and Reynolds told them the stories were inappropriate, personal, sensitive, and unsuitable. The students subsequently xeroxed the articles and distributed them to other students on the school premises. They were not punished for that act.[2]
 
 
 7
 On August 19, 1983, three Spectrum staff members filed this first amendment action seeking injunctive relief, money damages, and a declaration that their first amendment rights were violated. The district court denied injunctive relief, 596 F.Supp. 1422, and held that the students' first amendment rights were not violated, 607 F.Supp. 1450.
 
 
 8
 On appeal, appellants contend that the district court erred in 1) determining that Spectrum was not a public forum, 2) determining that the district's censorship did not violate the students' first amendment rights, 3) refusing to invalidate the district's policies and regulations regarding student expression, and 4) denying them their right to a jury trial.
 
 DISCUSSION
 I.
 
 9
 The starting point for any analysis of the first amendment rights of high school students is Tinker v. Des Moines Indep. Community School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). There, the Court held a high school regulation prohibiting students from wearing black armbands in protest of the Vietnam War violated the first amendment. Tinker, 393 U.S. at 506, 89 S.Ct. at 736. The Court reasoned that secondary students do not "shed their constitutional rights to freedom of speech or expression at the school house gate." Id. at 506, 89 S.Ct. at 736. Those rights are not absolute, however, and must be "applied in light of the special circumstances of the school environment." Id. at 506, 89 S.Ct. at 736. Nevertheless, though the first amendment rights of students are not co-extensive with those of adults, student expression may be curtailed only when it "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." Id. at 513, 89 S.Ct. at 740; see Burnside v. Byars, 363 F.2d 744 (5th Cir.1966); Blackwell v. Issaquena, 363 F.2d 749 (5th Cir.1966).
 
 
 10
 Here, the district court concluded that in the context of a high school newspaper case, the Tinker test applies only to papers which are public forums. A standard more deferential to the interests of school officials is applied where the newspaper is an integral part of the school curriculum. The court found that Spectrum fell in the latter category because:
 
 
 11
 Spectrum was produced by members of the Journalism II class, which class was taught by a faculty member according to the Hazelwood East curriculum guide. * * * A textbook was used in the class, and a grade and academic credit was awarded for completion of the class. * * * The curriculum guide of Hazelwood East described the Journalism II class as a "laboratory situation", and Spectrum was the laboratory exercise. * * * Spectrum's staff was essentially restricted to students in the journalism class, said class met regularly in a classroom to work on Spectrum, and the nature of the out-of-class work required for Spectrum was not substantially greater than that required in other courses taught at Hazelwood East. * * * Board Policy 348.51 stated that school-sponsored publications, of which Spectrum was one, were "developed within the adopted curriculum". * * * The amount of extra-duty pay received by Mr. Stergos does not indicate that his services in connection with Spectrum were in the nature of an extracurricular activity. * * * [T]he nature and extent of the * * * teacher's control * * * with respect to almost every aspect of producing Spectrum, as well as the control or pre-publication review exercised by [others] Hazelwood officials in the past [.] * * * That control was not exercised to any lesser extent with respect to the articles in question.
 
 
 12
 We disagree with the district court and hold that Spectrum is a public forum because it was intended to be and operated as a conduit for student viewpoint. Although Spectrum was produced by the Journalism II class, it was a "student publication" in every sense. The students chose the staff members, determined the articles to be written and printed, and determined the content of those articles. As advisor Stergos testified: "It's a student paper, so that the students, first of all, decided the stories, and, you know, wrote the stores, so they obviously were deciding the content. They were writing them. I would help if there were any matters that they had questions of, legalwise or ethicalwise, but--."
 
 
 13
 Spectrum covered topics of general interest to the student body. Since 1976, it had published stories dealing with teenage dating, students' use of drugs and alcohol, the desegregation of the St. Louis schools, religions, cults, and runaways. With over 4,500 copies being sold in the 1982-83 school year ($1,166.84 in sales at $ .25 a copy), the newspaper was distributed to both the school and to the public. Additionally, at the beginning of each school year, Spectrum published a policy statement,[3] announcing that it was a student newspaper, that its publication policy would be guided by the first amendment, that the articles and editorials reflected the view of the staff and not the administrators or faculty of the high school, and that it followed the standards set forth in the journalism class textbook.[4]
 
 
 14
 Moreover, in the January 14, 1980 issue of Spectrum, a non-by-lined editorial was printed entitled "The Right to Write." This editorial described Spectrum as follows:
 
 
 15
 Because Spectrum is a member of the press and especially because Spectrum is the sole press of the student body, Spectrum has a responsibility to that student body to be fair and unbiased in reporting, to point out injustice and, thereby, guard student freedoms, and to uphold a high level of journalistic excellence. This may, at times, cause Spectrum to be unpopular with some. Spectrum is not printed to be popular. Spectrum is printed to inform, entertain, guide and serve the student body--no more, and hopefully, no less,
 
 
 16
 And, Board Policy 348.5, entitled "Student Publications" provided: "Students are entitled to express in writing their personal opinions." A second board policy, Board Policy 348.51 provided: "School sponsored student publications will not restrict free expression or diverse viewpoints within the rules of responsible journalism." A third board policy, No. 341.5, entitled "Controversial Issues," provided:
 
 
 17
 [S]tudent[s] shall have rights * * *.
 
 
 18
 * * *
 
 
 19
 * * *
 
 
 20
 a. * * * to study any controversial issue which has political, economic, or social significance, and concerning which (at his/her level) he/she should begin to have an opinion.
 
 
 21
 b. * * * to have access to all relevant information, including the materials which circulate freely in the community.
 
 
 22
 c. * * * to study under competent instruction in an atmosphere free from prejudice and bias.
 
 
 23
 d. * * * to form and express one's own opinions on the controversial issues without, thereby, jeopardizing the relationship with the teacher or with the school.
 
 
 24
 Although, as the district court noted, Spectrum was produced by members of the Journalism II class, its staff was essentially restricted to students of that class and Spectrum was a part of the school adopted curriculum, it was something more. It was a forum in which the school encouraged students to express their views to the entire student body freely, and students commonly did so. Spectrum was not just a class exercise in which students learned to prepare papers and hone writing skills, it was a public forum established to give students an opportunity to express their views while gaining an appreciation of their rights and responsibilities under the First Amendment to the United States Constitution and their state constitution.
 
 
 25
 Our conclusion that Spectrum is not a curricula paper but rather a public forum is supported by numerous courts.
 
 
 26
 In Gambino v. Fairfax County School Board, 429 F.Supp. 731 (E.D.Va.), aff'd, 564 F.2d 157 (4th Cir.1977), a high school newspaper, produced by students in a journalism class, was deemed a free speech forum: "[T]his instrument was conceived, established, and operated as a conduit for student expression on a wide variety of topics. It falls clearly within the parameters of the First Amendment." Gambino, 429 F.Supp. at 735.
 
 
 27
 In Fraser v. Bethel School District No. 403, 755 F.2d 1356 (9th Cir.1985), cert. granted, --- U.S. ----, 106 S.Ct. 56, 88 L.Ed.2d 45 (1985), a school-sponsored assembly was not part of the curriculum: "The assembly was in the best sense a student activity; the candidates and their nominators were on their own, free to exercise their individual judgments about the content of their speeches." Fraser, 755 F.2d at 1364. See Bayer v. Kinzler, 383 F.Supp. 1164 (E.D.N.Y.), aff'd without opinion, 515 F.2d 504 (2nd Cir.1975); Reineke v. Cobb County School District, 484 F.Supp. 1252 (N.D.Ga.1980).
 
 
 28
 Given that Spectrum is a public forum entitled to some first amendment protection, the question then is the extent of this protection. Although generally, a content based prohibition on speech in a public forum must be narrowly drawn to effectuate a compelling state interest, Widmar v. Vincent, 454 U.S. 263, 270, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981), the standard is somewhat lower in the context of a high school. In that setting, in order for a prohibition on protected speech to be adjudged valid, school officials must demonstrate that the prohibition was "necessary to avoid material and substantial interference with school work or discipline * * * or the rights of others." Tinker, 393 U.S. at 511, 89 S.Ct. at 739; Nicholson v. Board of Education, 682 F.2d 858, 863 n. 3 (9th Cir.1982); Trujillo v. Love, 322 F.Supp. at 1266, 1270 (D.Col.1971). See also Bender v. Williamsport, 741 F.2d 538, 547 (3rd Cir.1984) (opportunity of high school student to exercise rights in public forum not co-extensive with rights of adults). Thus, the inquiry here is whether Hazelwood East officials have demonstrated facts which would have led them to reasonably forecast that the publication of two pages of the May 13th edition of Spectrum would have materially disrupted classwork, given rise to substantial disorder, or invaded the rights of others.[5]
 
 
 29
 The district court enumerated several justifications for the censorship here.
 
 
 30
 1) Principal Reynolds' belief that publication could not be delayed;
 
 
 31
 2) The defendants' expert's belief that publication of the pregnancy case study would create the impression that the school endorses the sexual norms of the girls in the article;
 
 
 32
 3) The judgment of school officials that the pregnancy case study was not appropriate, given the age and maturity of some of its readers.
 
 
 33
 4) Reynolds' belief that the pregnant girls' anonymity would be lost and thus the story invaded the privacy of the girls, the fathers, and the parents of both;5) The belief of Reynolds and the defendants' expert that the divorce article should not be printed because one student was identified and her parent were not given the opportunity to respond.
 
 
 34
 We find that none of these reasons justify the censorship.
 
 
 35
 First, we observe there is no evidence in the record that the principal could have reasonably forecast that the censored articles or any materials in the censored articles would have materially disrupted classwork or given rise to substantial disorder in the school. Indeed, there is no claim made on appeal that such was the case.
 
 
 36
 Second, it is clear that the administrators' claimed inability to delay publication did not justify censoring two full pages of the May 13th issue when at most only two articles on those pages were objectionable. The apparent reason for this was administrative convenience. It is clear from the record that there was no specific timetable for publication of that or any other issue, thus the principal could have delayed publication long enough to seek student concurrence to the changes he proposed. Also, the school has cited no reason why it couldn't publish the deleted pages with only the allegedly objectionable articles excised.
 
 
 37
 Third, there is no evidence in this record which supports the administrators' fear that the pregnancy case study would create the impression that the school endorsed the sexual norms of the students interviewed. "A corollary of the finding that [Spectrum] was established as a vehicle for First Amendment expression and not as an official publication is that the newspaper cannot be construed objectively as an integral part of the curriculum offered at [Hazelwood East]. * * * Rather it occupies a position more akin to the school library[.] * * * [Thus] the material is not suppressible by reason of its objectionability to the sensibilities of the [administrators]." Gambino v. Fairfax County School Board, 429 F.Supp. 731, 736 (E.D.Va.), aff'd, 564 F.2d 157 (4th Cir.1977). Nor is there evidence in this record to support the administrators' view that the article was inappropriate for publication in Spectrum, given the age and immaturity of some of its readers. Unfortunately teenage pregnancy is a problem in nearly every high school in the United States, including Hazelwood East. The students in the high school, including the freshmen and sophomores, are aware of the problem, and it is most unlikely that anything in the articles would offend their sensibilities. See Shanley v. Northeast Independent School District, 462 F.2d 960 (5th Cir.1972).
 
 
 38
 We are left then with the heart of this case: whether the principal justifiably censored the divorce story because it identified one freshman, and the pregnancy case study because it allegedly invaded the privacy of the fathers and the pregnant girls' parents.
 
 
 39
 We must first determine what the Tinker Court meant by "invasion of the rights of others."
 
 
 40
 The Tinker Court took the language for this test from Blackwell v. Issaquena, 363 F.2d 749 (5th Cir.1966) where students distributed buttons to their peers, in part by accosting unwilling wearers on school grounds and pinning the buttons to them. The Blackwell Court upheld a school regulation forbidding students to wear the buttons in light of the "commotion, boisterous conduct, [and] collision with the rights of others" involved in the distribution of the buttons. Blackwell, 363 F.2d at 754.
 
 
 41
 Very few courts have defined the parameters of "invasion of the rights of others." The Second Circuit held, over a convincing dissent, that the distribution to students of a sex questionnaire invaded the rights of others. Trachtman v. Anker, 563 F.2d 512 (2nd Cir.1977). At least one law review article suggests, however, that "invasion of the rights of others" must refer only to a tortious act. Note, Administrative Regulation of the High School Press, 83 Mich.L.Rev. 625, 640 (1984). "Limiting school action under the invasion-of-rights justification to torts or potential torts means that a school can refer to previously defined legal standards to decide if it may constitutionally restrain student expression." Id. at 641. We are persuaded by this analysis and agree that school officials are justified in limiting student speech, under this standard, only when publication of that speech could result in tort liability for the school. Any yardstick less exacting than potential tort liability could result in school officials curtailing speech at the slightest fear of disturbance.
 
 
 42
 We can deal rather summarily with the divorce article because the testimony in the record is that Emerson, the faculty advisor, had deleted the student's name in the proofs that were to be returned to the printer. Thus, the story was nothing more than an ancedotal treatment of the subject of divorce. The three students questioned were each advised that their answers would be used in a newspaper article, but that their names would not be revealed. The author obtained the consent of all subjects quoted in her article, even where their names were not used. The article included quotes from a student identified only as "Junior." "My dad didn't make any money, so my mother divorced him," and "[m]y father was an alcoholic and he always came home drunk and my mom really couldn't stand it any longer." The named student provided this quote: "My dad wasn't spending enough time with my mom, my sister and I. He was always out of town on business or out late playing cards with the guys. My parents always argued about everything." "In the beginning I thought I caused the problem, but now I realized it wasn't me," added the student.
 
 
 43
 Underlying the deletion is the school district's feeling that these articles were inappropriate for high school students because: "divorce is per se an inappropriate subject for high school newspapers." Unfortunately, statistics reveal that a significant number of high school students have grown up in single parent homes due to divorce. Thus, a responsible treatment of this subject in the high school newspaper would not be shocking, or even new--it would be an outside and perhaps helpful, perspective on a well-known subject.
 
 
 44
 The pregnancy article detailed the anonymous accounts of three Hazelwood East girls who became pregnant, but school officials feared the girls would nevertheless be identified. And while the three students questioned agreed to being the subjects of a newspaper story, their boyfriends and parents did not.
 
 
 45
 On these facts, the only tort action which, conceivably, could have been maintained against Hazelwood East had the pregnancy case study been published is that of invasion of privacy. This tort includes "publicity, of a highly objectionable kind, given to private information about the plaintiff even though it is true and no action would lie for defamation." W. Prosser & W. Keaton, The Law of Torts 809 (4th Ed.1971). The American Bar Association's Juvenile Justice Standards Project Relating to Schools and Education would permit restriction of student expression that "is violative of another person's right of privacy by publicity exposing details of such person's life, the exposure of which would be offensive and objectionable to a reasonable person of ordinary sensibilities * * *." American Bar Assn., Standards Relating to Schools and Education 84 (1982). Certainly the parents of the girls could not maintain this tort against the school because the article did not expose any details of the parents' lives, only about the students, and they fully consented. Almost as inconceivable is the prospect of the fathers maintaining this tort action. The fathers were not named in the article, thus they could only be identified by persons who previously had knowledge of the revealed facts. Thus, there would have been no disclosure. We conclude that because no tort action based on the articles could have been maintained against Hazelwood East, schools officials were not justified in censoring the two articles based on the Tinker "invasion of the rights of others" test.
 
 
 46
 Finally, we are asked to remand this matter to the district court for determination of damages. After a review of the record, we are thoroughly convinced that the facts here would not, under any circumstances, give rise to anything other than nominal damages. We thus remand to the district court with directions to determine the amount, if any, of damages. Appellants may, within thirty days, make an appropriate motion to this Court for an allowance of attorneys' fees on appeal. The appellee will then have fifteen days to respond to the application. On remand, the district court will, after, application and hearing, determine the appropriate fee to be allowed to appellants at the district court level.
 
 II.
 
 47
 We now turn to the question regarding the regulations which govern Spectrum's content. Appellants seek a declaration that Hazelwood School Board Policies Nos. 348.5,[6] 348.51,[7] and Principal Reynolds's oral directive that each issue of Spectrum be submitted to him for review prior to publication, are constitutionally invalid. Specifically, appellants claim that these regulations are constitutionally infirm because: 1) they do not adequately apprise students with sufficient definitions, as to what expression can and cannot be printed; 2) they do not provide specific criteria with which to judge student expression; and 3) they do not delineate an adequate and prompt appeals procedure. In substance, the students ask us to rewrite the regulations for the board of education. This we decline to do. We believe that the board of education and the school administrators will make such adjustments to the regulations necessary to comport with the constitutional standards outlined in this opinion.
 
 
 48
 In the event that school administrators censor student writings on the basis of Tinker, they are obligated to give the students an early opportunity to alter the materials to conform with the appropriate standards. See Note, Administrative Regulation of the High School Press, supra at 647. Moreover, if the students challenge the right of the administrator to limit student speech, the burden is on the school administrators to justify their actions under the Tinker standard. Shanley v. Northeast Independent School District, 462 F.2d 960, 970 (5th Cir.1972); Reineke v. Cobb County School District, 484 F.Supp. 1252, 1257 (N.D.Ga.1980).
 
 III.
 
 49
 We now turn to the jury trial question. Finding "the factual disputes * * * inextricably intertwined with the central legal issues," the district court determined that the declaratory relief and liability questions should be heard by the court sitting without a jury. Accordingly, it bifurcated these issues from the issue of damages. Appellants claim that they were unconstitutionally denied their right to a jury trial on the issues of whether Spectrum was a public forum and whether the controversial articles would have materially disrupted school discipline on the grounds that these were issues of fact and not questions of law.
 
 
 50
 We have already held that Spectrum was a public forum and that there is no substantial evidence that the articles in question would have materially disrupted school discipline. These holdings favor plaintiffs' positions on both issues. It is therefore unnecessary to pursue the question whether the district court erred in denying a jury trial on these very questions. A holding one way or the other on the jury-trial point would have no effect on the outcome of the case. It would be an advisory opinion only, and such opinions are to be avoided. Cf. National Football League v. McBee & Bruno's, Inc., 792 F.2d 726, 729 n. 4 (8th Cir.1986), (question whether trial by jury should have afforded on claim for damages under the Copyright Act not reached, because no damages were awarded).
 
 
 51
 Accordingly, we express no view on the jury-trial issue tendered by appellants.
 
 
 52
 WOLLMAN, Circuit Judge, dissenting.
 
 
 53
 The district court found that Spectrum was a school-sponsored, faculty-supervised, integral part of the school's journalism curriculum. This finding amply supports the district court's conclusion that Spectrum was not a public forum. That Spectrum may have constituted a vehicle for the expression of student viewpoints was incidental to its primary purpose of giving students a hands-on opportunity to put their theory into practice.
 
 
 54
 Having incorporated into the curriculum a newspaper for the purpose of giving students an opportunity to develop the skills and knowledge imparted in the journalism courses of which the newspaper is an integral part, may school officials constitutionally decline to publish certain articles for fear of the consequences those articles may engender? For the reasons set forth in Seyfried v. Walton, 668 F.2d 214 (3rd Cir.1981), I would hold that they may. True, in Seyfried it was the production of a school play having graphic sexual content that school officials halted rather than publication of a newspaper article, but that distinction is not critical in view of the court's emphasis on the fact that the play was an integral part of the school's educational program and that participation in the play "was considered a part of the curriculum in the theater arts." 668 F.2d at 216. In this regard, we should note that even those who give broadest scope to the authority of the courts to review the decisions of school boards pause when matters of curriculum are concerned. See Board of Education, Island Trees Union Free School District No. 26 v. Pico, 457 U.S. 853, 869, 102 S.Ct. 2799, 2809, 73 L.Ed.2d 435 (1982). Likewise should we.
 
 
 55
 Students' first amendment rights of personal expression, as spelled out in Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), should not be held to give rise to a collective first amendment right to publish a school-sponsored, faculty-supervised newspaper with the same lack of constraints enjoyed by the commercial press or, for that matter, a solely student-sponsored, extracurricular paper totally removed from the aegis of the school. A contrary holding, as exemplified by the majority opinion, pits students against school officials in a battle for control over what is rightfully within the province of school officials. See Pico, 457 U.S. at 885, 102 S.Ct. at 2817 (Burger, C.J., dissenting); at 894, 102 S.Ct. at 2822 (Powell, J. dissenting).
 
 
 56
 The majority opinion consigns school officials to chart a course between the Scylla of a student-led first amendment suit and the Charybdis of a tort action by those claiming to have been injured by the publication of student-written material. Although the commercial press can well afford to retain counsel to advise them daily on questions of possible liability, not many school districts possess similar resources.
 
 
 57
 It may be that the defendant school officials acted out of a too abundant sense of caution. We judges are not journalists, however, and even less school administrators. Granting the defendant school officials the deference due them, I would hold that they committed no constitutional violation in declining to publish the articles in question.
 
 
 58
 I would affirm the district court's judgment.
 
 
 
 [1]
 The three other articles discussed runaways, teen pregnancy generally, and the "squeal law." They were removed only because they were on the same pages as the allegedly objectionable articles
 
 
 [2]
 This point emphasizes that the controversy over the articles served only to ensure that the offending articles were secured and widely read
 
 
 [3]
 
 SPECTRUM
 Statement of Policy
 Spectrum is a school funded newspaper; written, edited, and designed by members of the Journalism II class with assistance of adviser Mr. Robert Stergos.
 Spectrum follows journalism guidelines that are set by Scholastic Journalism textbook * * *. The newspaper will not attack any individual. However, any group, organization or club may be subject to examination and/or criticism.
 All non-by-lined editorials appearing in this newspaper reflect the opinions of the Spectrum staff, which are not necessarily shared by the administrators or faculty of Hazelwood East. All by-lined editorials reflect only the opinions of the writer.
 Spectrum welcomes all student, faculty and community input, including suggestions, story ideas, news tips, and letters-to-the-editors. * * * Spectrum staff will not edit any letters, but all letters may be subject to condensing if there is a space limitation. A letter will not be printed if it is libelous, obscene, or against the general policy of the newspaper.
 Spectrum will be published approximately every three weeks. It will be sold during the school day for the price of 25 cents.
 * * *
 Spectrum, as a student-press publication, accepts all rights implied by the First Amendment of the United States Constitution which states that: "Congress shall make no law restricting * * * or abridging the freedom of speech or the press * * *."
 That this right extends to high school students was clarified in the Tinker vs. De Moines Community School District case in 1969.
 
 
 [4]
 This textbook provided:
 I. Rights and Responsibilities of the Student Press
 A. Student press has essentially the same rights and responsibilities as the mass media.
 B. Neither "students nor teacher shed their constitutional rights to freedom of speech or expression at the school house gate"--from TINKER vs. DES MOINES COMMUNITY SCHOOL DISTRICT (1969).
 * * *
 C. " * * * undifferentiated fear or apprehension of disturbance (in schools) is not enough to overcome the right of freedom of expression."--from TINKER.
 D. Student conduct or speech must "materially and substantially interfere with the requirements of appropriate discipline" to be found unacceptable.
 * * *
 F. Prior restraint versus susequent punishment becomes an important distinction.
 
 
 [1]
 The "forecast" rule is not a basis for prior restraint or censorship
 
 
 [2]
 Fear of school disruption is not a reason or excuse for establishing a system of censorship
 
 
 [3]
 "Forecast" rule is a formula for determining when students may be punished after publication of disputed material
 
 
 [4]
 Students face subsequent punishment through legal action in areas of libel, invasion of privacy, and obsenity, as do all journalists
 
 
 [5]
 Requirements of school discipline may justify punishment for speech that does disrupt school activities
 School authorities have the power to enforce reasonable regulations as to time, place, and manner of speech and its distribution.
 
 
 [5]
 The students argue that because Tinker is a punishment case, it does not authorize administrators to exercise prior restraint. Support for this view lies not only in the textbook used by the students (supra note 4), but in established case law. Fujishima v. Board of Education, 460 F.2d 1355 (7th Cir.1972). We think the better view, however, is that the Tinker standards are to be applied whenever administrators can reasonably predict that the content of a student publication will violate the Tinker standard. Shanley v. Northeast Indep. School Dist., 462 F.2d 960 (5th Cir.1972); Quarterman v. Byrd, 453 F.2d 54 (4th Cir.1971); Eisner v. Stamford Bd. of Educ., 440 F.2d 803 (2d Cir.1971); see also Nicholson v. Board of Educ., 682 F.2d 858, 863 (9th Cir.1982); Riseman v. School Comm. 439 F.2d 148 (1st Cir.1971); Note, Administrative Regulation of the High School Press, 83 Mich.L.Rev. 625, 635 (1984). Of course, if student writings are to be censored prior to publication, the least restrictive means are to be followed
 
 
 [6]
 Hazelwood School Board Policy No. 348.5, entitled "Student Publications," states:
 a. Students are entitled to express in writing their personal opinions. The distribution of such material on school property may not interfere with or disrupt the educational process. Such written expressions must be signed by the authors.
 b. Students who edit, publish or distribute hand-written, printed or duplicated matter among their fellow students within the schools must assume responsibility for the content of such publications.
 c. Libel, obscenity, and personal attacks are prohibited in all publications.
 d. Unauthorized commercial solicition will not be allowed on school property at any time. An exception to this rule will be the sale of non-school sponsored student newspapers published by students of the District at times and in places as designated by school authorities.
 
 
 [7]
 Hazelwood School Board Policy No. 348.51, entitled "School Sponsored Publications," states:
 School sponsored publications will not restrict free expression or diverse viewpoints within the rules of responsible journalism. School sponsored publications are developed within the adopted curriculum and its educational implications in regular classroom activities.
 Students who are not in the publications classes may submit material for consideration according to the following conditions:
 a. All material must be signed.
 b. The material will be evaluated by an editorial review board of students from the publication classes.
 c. A faculty-student review board composed of the principal, publications teacher, two other classroom teachers, and two publications students will evaluate the recommendations of the student editorial board. Their decision will be final.
 No material shall be considered suitable for publication in student publications that is commercial, obscene, libelous, defaming to character, advocating racial or religious prejudice, or contributing to the interruption of the education process.