822 F.2d 747
 40 Ed. Law Rep. 641, 14 Media L. Rep. 1517
 Cory BYSTROM, a minor, By and Through Robert and Helen
BYSTROM, his parents and natural guardians; Adam Collins, a
minor, By and Through Michael and Melinda Collins, his
parents and natural guardians; John Collins; Jeremy
Scott-Martin Saperstein; and David Drangeid, a minor, By
and Through Gerald Drangeid, his father and natural
guardian, Appellees,
v.
FRIDLEY HIGH SCHOOL, INDEPENDENT SCHOOL DISTRICT NO. 14, a
municipal corporation; Dr. Dennis Rens, individually and as
Superintendent of Independent School District No. 14; and
Donald Meyers, individually and as principal of Fridley High
School, Appellants.
 No. 86-5140.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 17, 1986.
Decided June 25, 1987.
Rehearing and Rehearing En Banc Denied Aug. 28, 1987.
 
 David R. Hols, Minneapolis, Minn., for appellants.
 Stephen Foley, Minneapolis, Minn., for appellees.
 Before McMILLIAN, Circuit Judge, HENLEY, Senior Circuit Judge, and ARNOLD, Circuit Judge.
 ARNOLD, Circuit Judge.
 This case raises questions of the right of public high school authorities to regulate or prohibit the distribution on school property of written material prepared by students or others. We are required to answer two questions: First, does the First Amendment, as applied to the States by the Due Process Clause of the Fourteenth Amendment, absolutely prohibit any form of prior restraint on such distribution? Second, if the answer to the first question is no, is the policy of Independent School District No. 14 of Fridley, Minnesota, on distribution of unofficial written material on school premises consistent with the First Amendment? We hold that prior restraint is not unconstitutional per se in this limited area, and that the school policy before us in this case is, with one important exception, constitutional.
 I.
 The plaintiffs, students at Fridley High School, brought this suit under 42 U.S.C. Sec. 1983 for declaratory and injunctive relief. The defendants are the school district, its superintendent, and the principal of Fridley High School. The students wished to distribute, and in fact did distribute on school premises, an "underground newspaper" known as Tour de Farce.[1] Defendants claimed the right to review in advance any such publication and to prevent its distribution on school property unless it complied with school-district rules entitled "Distribution of unofficial written material on school premises."[2] Both sides moved for summary judgment, and the case was submitted on stipulated facts. J.A. 38-42. After hearing argument, the District Court held the school policy unconstitutional "particularly as it refers to prior restraint...." Transcript of Summary Judgment Ruling (Tr.) 30, J.A. 45. It also specifically held invalid Guidelines C (referring to writings that are "pervasively indecent or vulgar") and E (referring to writings that "invade [ ] the privacy of another person or endanger[ ] the health or safety of another person.") The Court said: "Guideline C, the pervasively indecent or vulgar language is clearly unconstitutional as vague and overbroad." Tr. 29, J.A. 44.
 
 II.
 
 1
 We begin with a word about the legal context in which this case arises. Only distribution "on school property," J.A. 3, is at issue here. The school district asserts no authority to govern or punish what students say, write, or publish to each other or to the public at any location outside the school buildings and grounds. If school authorities were to claim such a power, quite different issues would be raised, and the burden of the authorities to justify their policy under the First Amendment would be much greater, perhaps even insurmountable. See, e.g., Thomas v. Board of Educ., Granville Cent. School Dist., 607 F.2d 1043 (2d Cir.1979), cert. denied, 444 U.S. 1081, 100 S.Ct. 1034, 62 L.Ed.2d 765 (1980). Moreover, we deal here only with secondary schools.[3] Specifically, what we say in this opinion does not apply to college or other post-secondary campuses and students. Few college students are minors, and colleges are traditionally places of virtually unlimited free expression. See, e.g., Stanley v. Magrath, 719 F.2d 279 (8th Cir.1983).
 
 
 2
 We can understand the District Court's apparent feeling that the policy involved here is invalid simply because it involves a prior restraint on the freedom of the press. Prior restraints are traditionally the form of regulation most difficult to sustain under the First Amendment, see, e.g., Near v. Minnesota ex rel. Olson, 283 U.S. 697, 713-20, 51 S.Ct. 625, 630-32, 75 L.Ed. 1357 (1931), though "the protection even as to previous restraint is not absolutely unlimited," id. at 716, 51 S.Ct. at 631. At the time of the District Court's ruling, the validity of prior restraints applied to high-school students was an open question in this Circuit. But since that time, we have clearly rejected the view that prior restraints are per se unconstitutional in the high-school context. Kuhlmeier v. Hazelwood School Dist., 795 F.2d 1368, 1374 n. 5 (8th Cir.1986), cert. granted, --- U.S. ----, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987). This panel is bound by Kuhlmeier, and we therefore now hold that defendants' policy is not unconstitutional merely because it asserts a right of prior review and restraint on the part of school authorities.
 
 III.
 
 3
 We therefore turn to the particulars of defendants' policy. Plaintiffs attack it in several respects, each of which we shall discuss. Before doing so, we venture a few general observations. First, many of the terms and phrases contained in the policy are not specific. They are attacked as vague, general, and overbroad, and concededly some of the wording is much more general than what we are accustomed to in many areas of the law. Yet, we must remember that a high degree of generality is made necessary by the subject matter. The concepts involved (indecency, vulgarity, likelihood of material disruption) are general by their very nature. But violation of these guidelines does not subject anyone to criminal sanctions, nor do they apply to the public at large or to territory outside school property. The addressees of this policy are not fully sui juris; they are minors, or at least most of them are. The guidelines are designed to assure that school hours and school property are devoted primarily to education as embodied in the district's prescribed curriculum. Their purpose is to preserve some trace of calm on school property. They are one expression of the "legitimate and substantial community interest in promoting respect for authority and traditional values be they social, moral, or political." Board of Educ., Island Trees Union Free School Dist. No. 26 v. Pico, 457 U.S. 853, 864, 102 S.Ct. 2799, 2806, 73 L.Ed.2d 435 (1982) (opinion of Brennan, J., joined by Marshall and Stevens, JJ., announcing the judgment of the Court) (internal quotation omitted).
 
 
 4
 1. Guideline A prohibits material that is "obscene to minors." This phrase is defined as follows:
 
 
 5
 "Obscene to minors" is defined as:
 
 
 6
 (a) The average person, applying contemporary community standards, would find that the written material, taken as a whole appeals to the prurient interest of minors of the age to whom distribution is requested;
 
 
 7
 (b) The material depicts or describes, in a manner that is patently offensive to prevailing standards in the adult community concerning how such conduct should be presented to minors of the age to whom distribution is requested, sexual conduct such as intimate sexual acts (normal or perverted), masturbation, excretory functions, and lewd exhibition of the genitals; and
 
 
 8
 (c) The material, taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.
 
 
 9
 This definition is consistent with Supreme Court authority on the power of government to regulate distribution of written material to minors. See Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968). It is settled that states may "accord minors ... a more restricted right than that assured to adults to judge and determine for themselves what sex material they may read or see." Id. at 637, 88 S.Ct. at 1279. In fact, the language selected by the school board to define "obscene to minors" is quite similar to the definition of this phrase recommended in a policy statement on public secondary school student publications drafted by the Minnesota Coalition Against Censorship, a group of public-interest organizations including the Minnesota Civil Liberties Union, the Minnesota Education Association, and others. J.A. 31, 35-36.[4]
 
 
 10
 Plaintiffs contend, however, that the decision whether a certain writing is obscene as to minors may be made only by a court, not by school authorities. On this view, material obscene as to minors could be freely circulated within the school until school authorities filed suit and obtained a judicial determination that the material violated the relevant legal definition. For this proposition plaintiffs cite Thomas v. Board of Educ., supra. Thomas does hold, 607 F.2d at 1048, that "the constitutional status of speech [should] be determined by the judiciary," but this statement is made with respect to efforts to prevent or punish speech "[i]n the community-at-large," ibid. In Thomas, "all but an insignificant amount of relevant activity ... was deliberately designed to take place beyond the schoolhouse gate," id. at 1050. Here, of course, we deal with a restraint that will apply only on school property. The difference is decisive. The applicable law, we think, is well stated in Eisner v. Stamford Board of Educ., 440 F.2d 803, 810 (2d Cir.1971), a case whose authority is recognized and left unimpaired by Thomas. (In fact, Chief Judge Kaufman wrote for the Second Circuit in both cases.) The Eisner Court said:
 
 
 11
 ... it would be highly disruptive to the educational process if a secondary school principal were required to take a school newspaper editor to court every time the principal reasonably anticipated [a violation of schoolboard policy with respect to publication.] Thus, we will not require school officials to seek a judicial decree before they may enforce the Board's policy.
 
 
 12
 440 F.2d at 810 (footnote omitted).
 
 
 13
 Plaintiffs also argue that "merely parroting the legal definition of obscenity [as to minors] does not satisfy the constitutional requirement of certainty and of narrow and precise guidelines." Brief for Appellees 28. This argument finds support in Nitzberg v. Parks, 525 F.2d 378, 383 (4th Cir.1975) (Clark, Associate Justice, retired), and Jacobs v. Board of School Commissioners, 490 F.2d 601, 605 (7th Cir.1973), vacated as moot, 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975). But we believe it is inconsistent with controlling Supreme Court authority and therefore reject it. In Ginsberg v. New York, supra, the Court had before it a state criminal statute defining obscenity "harmful to minors," a definition certainly no more specific and definite than the provision of school policy before us in this case. The contention was made (as it is here) that the definition was void for vagueness. The statute, however, had been construed by the state courts to be virtually identical to the Supreme Court's own most recent statement of the elements of obscenity. Such a definition, according to Mr. Justice Brennan, writing for the Court in Ginsberg, necessarily gives adequate notice of what is prohibited "and does not offend the requirements of due process." 390 U.S. at 643, 88 S.Ct. at 1282. By a parity of reasoning, the Fridley guidelines' definition of "obscene to minors," which is acknowledged on all sides to be a virtual restatement of the Supreme Court's own holdings, is not void for vagueness.
 
 
 14
 2. Plaintiffs also object to guideline B, which prohibits "expression which ... is libelous...." J.A. 24. Plaintiffs fear that the school board's definition of libel gives no consideration to the question of privilege and omits any requirement of actual malice, as that concept is explained in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). We disagree with this reading of the policy. The definition section specifically defines "libelous" as "a false and unprivileged statement...." J.A. 28. We understand the inclusion of the word "unprivileged" to be, in effect, an incorporation by reference of the New York Times doctrine, under which certain statements about public figures or matters of public interest are privileged under the First Amendment. As so interpreted, we see no constitutional infirmity in defendants' guidelines. The First Amendment rights of students do not extend to expression that "involves ... invasion of the rights of others," Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 513, 89 S.Ct. 733, 740, 21 L.Ed.2d 731 (1969), and in Kuhlmeier, supra, 795 F.2d at 1376, we read this phrase as including only "that speech [which] could result in tort liability." The present policy is thus consistent with both Tinker and Kuhlmeier.
 
 
 15
 3. Guideline C prohibits material that "is pervasively indecent or vulgar...." J.A. 24. Plaintiffs attack this language as vague and overbroad, and we can understand why. The concepts of indecency and vulgarity contain large elements of subjectivity, and whether a certain characteristic of a student writing is "pervasive" or only, perhaps, "sporadic" is also a question on which reasonable people might well differ. We nevertheless hold that this portion of the guidelines is valid. We believe this holding is compelled by Bethel School District No. 403 v. Fraser, --- U.S. ----, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), the Supreme Court's last pronouncement on the subject of free-speech rights of secondary-school students. (Bethel, like Kuhlmeier, was decided after the District Court's opinion in this case.)
 
 
 16
 The Bethel School District had a disciplinary rule prohibiting the use of obscene language as follows:
 
 
 17
 Conduct which materially and substantially interferes with the educational process is prohibited, including the use of obscene, profane language or gestures.
 
 
 18
 106 S.Ct. at 3162. Matthew Fraser, a student, delivered a speech, nominating a fellow student for student elective office, that school authorities considered indecent and lewd. The speech contained sexual images and innuendos. The Supreme Court upheld, as against First Amendment and due-process challenges, the imposition of discipline on Fraser. The Court observed, among other things, that "it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse.... The schools, as instruments of the state, may determine that the essential lessons of civil, mature conduct cannot be conveyed in a school that tolerates lewd, indecent, or offensive speech...." Id. at 3165.
 
 
 19
 This holding governs the present case. The guideline before us, referring to "pervasively indecent or vulgar" material, is, if anything, more protective of freedom than the rule upheld by the Supreme Court in Bethel. It is true that Bethel involved a speech given before a student assembly, so that the persons exposed to the speech were, arguably, more nearly in the position of a captive audience than students to whom the plaintiffs in this case might offer to hand written material. This possible difference, in our view, does not amount to a legal distinction making the Bethel rule inapplicable here. The Supreme Court in Bethel specifically quoted with approval a statement by Judge Newman, concurring in the result in Thomas, supra, 607 F.2d at 1057, that "the First Amendment gives a high school student the classroom right to wear Tinker's armband, but not Cohen's jacket." This reference to Cohen[5] makes clear that school boards have power to prohibit the introduction onto their property by students of written material pervaded or characterized by four-letter words that used to be considered unprintable.
 
 
 20
 We agree with the following statement of Judge Newman, inferentially approved by the Supreme Court in Bethel:
 
 
 21
 School authorities can regulate indecent language because its circulation on school grounds undermines their responsibility to try to promote standards of decency and civility among school children. The task may be difficult, perhaps unlikely ever to be more than marginally successful. But whether a school condemns or tolerates indecent language within its sphere of authority will have significance for the future of that school and of its students. The First Amendment does not prevent a school's reasonable efforts toward the maintenance of campus standards of civility and decency. With its captive audience of children, many of whom, along with their parents, legitimately expect reasonable regulation, a school need not capitulate to a student's preference for vulgar expression. A school's authority to condemn indecent language is not inconsistent with a student's right to express his views. In short, the First Amendment gives a high school student the classroom right to wear Tinker's armband, but not Cohen's jacket.
 
 
 22
 School authority to regulate indecent language aimed at school children can of course be abused, but school officials are not the final arbiters of their authority, nor do they have limitless discretion to apply their own notions of indecency. Courts have a First Amendment responsibility to insure that robust rhetoric in student publications is not suppressed by prudish failures to distinguish the vigorous from the vulgar.
 
 
 23
 607 F.2d at 1057.
 
 
 24
 4. Plaintiffs next object to guideline D, which refers to written material which "advertises any product or service not permitted to minors by law...." J.A. 24. We see nothing vague or objectionable about this prohibition. To be sure, commercial speech enjoys a degree of First Amendment protection, but this protection does not extend to advertisement of products that are themselves illegal. We think almost every high school student would recognize that this guideline refers, for example, to tobacco, liquor, and material that is obscene to minors. We note that the District Court did not specifically hold this guideline invalid.
 
 
 25
 5. The District Court did, however, invalidate guideline E, referring to material which "invades the privacy of another person or endangers the health or safety of another person...." J.A. 24. We agree with the District Court with respect to this portion of the guidelines. In Kuhlmeier, we held that written material could be forbidden or punished as invasive of the rights of others "only when publication ... could result in tort liability for the school." 795 F.2d at 1376. The common law of Minnesota does not recognize the tort of invasion of privacy. Hendry v. Conner, 303 Minn. 317, 319, 226 N.W.2d 921, 923 (1975); House v. Sports Films & Talents, Inc., 351 N.W.2d 684, 685 (Minn.Ct.App.1984). Accordingly, guideline E attempts to proscribe speech that could not subject the school or anyone else to tort liability. It therefore is inconsistent with our holding in Kuhlmeier and cannot stand.
 
 
 26
 6. Plaintiffs next challenge guideline G, referring to written material that "presents a clear and present likelihood that ... it will cause a material and substantial disruption of the proper and orderly operation and discipline of the school or school activities...." J.A. 24. Also relevant on this point is a later provision of the policy, reading as follows:
 
 
 27
 In order for expression to be considered disruptive, there must exist specific facts upon which the likelihood of disruption can be forecasted including past experience in the school, current events influencing student activities and behavior, and instances of actual or threatened disruption relating to the written material in question.
 
 
 28
 J.A. 27-28.
 
 
 29
 This guideline is intended to codify the rule of Tinker v. Des Moines Community School District, supra, involving an attempt by high-school students to wear black armbands on school property to symbolize their protest against the Vietnam War. The Supreme Court struck down an attempt by school authorities to discipline this expression of opinion and held that "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." 393 U.S. at 508, 89 S.Ct. at 737. In order to punish or prevent expression, school authorities would have to show that the forbidden speech would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school...." Id. at 509, 89 S.Ct. at 738 (internal quotation omitted).
 
 
 30
 We believe that the defendants' guidelines comply with Tinker. Much more than undifferentiated fear or apprehension is required here. School authorities must, instead, find the existence of specific facts upon which the likelihood of disruption can be forecast, and the guidelines even go on to list examples of such facts. The policy before us on this appeal is thus much more specific than that upheld by the Second Circuit in Eisner, supra, where the school board's rule simply prohibited material which "will interfere with the proper and orderly operation and discipline of the school, will cause violence or disorder, or will constitute an invasion of the rights of others." 440 F.2d at 805. The Second Circuit upheld the validity of this policy, noting that it "track[ed] the present state of the authoritative constitutional law...." Id. at 808. We need not go so far as the Eisner court to uphold the much more specific and definite statement of policy adopted by defendants in this case.
 
 
 31
 7. Plaintiffs make a variety of other arguments against defendants' policy, all of which we hold to be without merit. Only one of them deserves specific mention. The policy contains a provision for appeal to the superintendent of schools from an adverse decision by a principal. Subsection II of the policy, J.A. 26, provides that if a person seeking to distribute written materials does not receive a response from the superintendent within three days of submitting the appeal, the person shall then contact the office of the superintendent to verify that the lack of response is not due to an inability to locate him or her. If this verification is obtained, and there has been no response to the appeal, the material may then be distributed. Plaintiffs complain that the reference to a "response" is too vague, that it fails to specify a time within which the superintendent of schools must make a decision on the appeal. We disagree with this rather grudging reading of the policy. We believe the reference to "response" does mean that the superintendent must make a decision within three days, and that, failing such a decision, the material may then be distributed, so long as the lack of decision is not due to the superintendent's inability to locate the person or persons desiring to circulate the written material in question.
 
 IV.
 
 32
 In short, we uphold defendants' policy, with the exception of guideline E, referring to invasion of privacy. On remand, the District Court is directed to vacate the judgment previously entered and enter a new judgment enjoining defendants from enforcing their policy unless and until they delete from it guideline E.
 
 
 33
 We deem it appropriate to add a few words of caution:
 
 
 34
 We have held only that the policy, as modified in accordance with this opinion, is not unconstitutional on its face. This does not mean that every application of the policy will be valid, or that it would have been valid if applied to prohibit distribution of the particular newspaper produced by these plaintiffs. If the policy is wrongly applied to speech that is constitutionally protected, the courts will be open to hear students' complaints, and "if the students challenge the right of the administrator to limit student speech, the burden is on the school administrators to justify their actions...." Kuhlmeier, supra, 795 F.2d at 1377. Further, "[i]n the event that school administrators censor student writings ..., they are obligated to give the students an early opportunity to alter the materials to conform with the appropriate standards." Ibid. Finally, we remind the defendants that criticism of established policies, even in vigorous or abrasive terms, is not to be equated with disruptiveness of constitutional magnitude under the Tinker standard. Defendants are not at liberty to suppress or punish speech simply because they disagree with it, or because it takes a political or social viewpoint different from theirs, or different from that subscribed to by the majority of the adults within any given school district. If penalties are to be imposed, they must be "unrelated to any political viewpoint." Bethel, supra, 106 S.Ct. at 3166.
 
 
 35
 Finally, we are certainly not holding that guidelines of the type we have upheld in this opinion are wise or advisable policy. That is not a judicial question. It is for school boards and administrators to decide whether to attempt to write and apply similar guidelines. Our holding is only that, if they choose to do so, their policy will not, on its face, violate the Federal Constitution.
 
 
 36
 Vacated and remanded with instructions.
 
 APPENDIX
 
 37
 I. Guidelines.
 
 
 38
 Students of Fridley Independent School District No. 14 have the right, protected by the First Amendment to the U.S. Constitution, to exercise freedom of speech. This includes the right to distribute, at reasonable times and places, unofficial written material, petitions, buttons, badges, or other insignia, except expression which:
 
 
 39
 (a) is obscene to minors;
 
 
 40
 (b) is libelous;
 
 
 41
 (c) is pervasively indecent or vulgar (secondary schools)/contains any indecent or vulgar language (elementary schools);
 
 
 42
 (d) advertises any product or service not permitted to minors by law;
 
 
 43
 (e) invades the privacy of another person or endangers the health or safety of another person;
 
 
 44
 (f) constitutes insulting or fighting words, the very expression of which injures or harasses other people (e.g., threats of violence, defamation of character or of a person's race, religion or ethnic origin);
 
 
 45
 (g) presents a clear and present likelihood that, either because of its content or the manner of distribution, it will cause a material and substantial disruption of the proper and orderly operation and discipline of the school or school activities, will cause the commission of unlawful acts or the violation of lawful school regulations.
 
 
 46
 Distribution on school premises of material in categories (a) through (e) to any student is prohibited. Distribution on school premises of material in categories (f) and (g) to a substantial number of students is prohibited.
 
 
 47
 II. Procedures.
 
 
 48
 Anyone wishing to distribute unofficial written material must first submit for approval a copy of the material to the Principal or his/her secretary twenty-four (24) hours in advance of desired distribution time, together with the following information:
 
 
 49
 1. Name and phone number of the person submitting request and, if a student, the homeroom number;
 
 
 50
 2. Date(s) and time(s) of day of intended display or distribution;
 
 
 51
 3. Location where material will be displayed or distributed;
 
 
 52
 4. The grade(s) of students to whom the display or distribution is intended.
 
 
 53
 Within twenty-four (24) hours of submission, the Principal (or his/her designee) will render a decision whether the material violates the Guidelines in subsection I or the time, place and manner restrictions in subsection III of this policy. In the event that permission to distribute the material is denied, the person submitting the request should be informed in writing of the reasons for the denial.
 
 
 54
 Permission to distribute material does not imply approval of its contents by either the School, the administration of the School, the School Board, or the individual reviewing the material submitted.
 
 
 55
 If the person submitting the request does not receive a response within twenty-four (24) hours of submission, the person shall contact the Office to verify that the lack of response was not due to an inability to locate the person. If the person has made this verification and there is no response to the request, the material may be distributed in accordance with the time, place and manner provisions in subsection III.
 
 
 56
 If the person is dissatisfied with the decision of the Principal (or his/her designee), the person may submit a written request for appeal to the Superintendent of Schools or his/her secretary. If the person does not receive a response within three (3) days (not counting Saturdays, Sundays and holidays) of submitting the appeal, the person shall contact the Office of the Superintendent to verify that the lack of response is not due to an inability to locate the person. If the person has made this verification and there is no response to the appeal, the material may be distributed in accordance with the time, place and manner provisions in subsection III.
 
 
 57
 At every level of the process, the person submitting the request shall have the right to appear and present the reasons, supported by relevant witnesses and material, as to why distribution of the written material is appropriate.
 
 
 58
 III. Time, Place and Manner of Distribution.
 
 
 59
 The distribution of written material shall be limited to a reasonable time, place, and manner as follows:
 
 
 60
 (1) No written material may be distributed during and at the place of a normal school activity if it is reasonably likely to cause a material and substantial disruption of that activity.
 
 
 61
 (2) Distribution of written material is prohibited when it blocks the safe flow of traffic within corridors and entrance ways of the school.
 
 
 62
 IV. Definitions.
 
 
 63
 The following definitions apply to the following terms as used in this policy.
 
 1. "Obscene to minors" is defined as:
 
 64
 (a) The average person, applying contemporary community standards, would find that the written material, taken as a whole appeals to the prurient interest of minors of the age to whom distribution is requested;
 
 
 65
 (b) The material depicts or describes, in a manner that is patently offensive to prevailing standards in the adult community concerning how such conduct should be presented to minors of the age to whom distribution is requested, sexual conduct such as intimate sexual acts (normal or perverted), masturbation, excretory functions, and lewd exhibition of the genitals; and
 
 
 66
 (c) The material, taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.
 
 
 67
 2. "Minor" means any person under the age of eighteen (18).
 
 
 68
 3. "Material and substantial disruption" of a normal school activity is defined as follows:
 
 
 69
 (a) Where the normal school activity is an educational program of the District for which student attendance is compulsory, "material and substantial disruption" is defined as any disruption which interferes with or impedes the implementation of that program.
 
 
 70
 (b) Where the normal school activity is voluntary in nature (including, without limitation, school athletic events, school plays and concerts, and lunch periods) "material and substantial disruption" is defined as student rioting, unlawful seizures of property, widespread shouting or boisterous conduct inappropriate to the event, participation in a school boycott, demonstration, sit-in, stand-in, walk-out, or other related forms of activity.
 
 
 71
 In order for expression to be considered disruptive, there must exist specific facts upon which the likelihood of disruption can be forecasted including past experience in the school, current events influencing student activities and behavior, and instances of actual or threatened disruption relating to the written material in question.
 
 
 72
 4. "School activities" means any activity of students sponsored by the school and includes, by way of example, and not by way of limitation, classroom work, library activities, physical education classes, official assemblies and other similar gatherings, school athletic contests, band concerts, school plays, and in-school lunch periods.
 
 
 73
 5. "Unofficial" written material includes all written material except school newspapers, literary magazines, year books, and other publications funded and/or sponsored or authorized by the school. Examples include leaflets, brochures, flyers, petitions, plaquecards [sic], and underground newspapers, whether written by students or others.
 
 
 74
 6. "Libelous" is a false and unprivileged statement about a specific individual that tends to harm the individual's reputation or to lower him/her in the esteem of the community.
 
 
 75
 7. "Distribution" means circulation or dissemination of written material by means of handing out free copies, selling or offering copies for sale and accepting donations for copies. It includes displaying written material in areas of the school which are generally frequented by students.
 
 
 76
 V. Disciplinary Action.
 
 
 77
 Distribution by any student of unofficial written material prohibited in subsection I or in violation of subsection III will be halted and disciplinary action will be taken in accordance with the procedures contained in Section ______. [This reference is apparently to another portion of the school rules, not at issue in this case.]
 
 
 78
 Any other party violating this policy will be requested to leave the school property immediately and, if necessary, the police will be called.
 
 
 79
 VI. Notice of Policy to Students.
 
 
 80
 A copy of this policy will be published in student handbooks and posted conspicuously in school buildings.
 
 
 81
 HENLEY, Senior Circuit Judge, concurring.
 
 
 82
 With a reservation to be mentioned I fully concur in my Brother Arnold's opinion. While I agree that this court's decision to affirm that portion of the district court's decision invalidating guideline E is controlled by our prior decision in Kuhlmeier v. Hazelwood School District, 795 F.2d 1368 (8th Cir.1986) (2-1 decision), cert. granted, --- U.S. ----, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987), I write separately to suggest that the holding in Kuhlmeier rests in part on an erroneous premise. In all other respects I join the court's opinion.
 
 
 83
 In Kuhlmeier the court concluded that "school officials are justified in limiting student speech [as an invasion of the rights of others] only when publication of that speech could result in tort liability for the school." Kuhlmeier, 795 F.2d at 1375-76.[1] Because invasion of privacy has not been recognized as an actionable tort in Minnesota, Hendry v. Conner, 303 Minn. 317, 319, 226 N.W.2d 921, 923 (1975); House v. Sports Films & Talents, Inc., 351 N.W.2d 684, 685 (Minn.Ct.App.1984),[2] the main opinion holds that guideline E must be stricken. This result follows because of the reverse focus of the analysis in Kuhlmeier.
 
 
 84
 Kuhlmeier decided that if the speech could result in tort liability, it is outside the scope of first amendment protection. I believe our inquiry should be whether the speech sought to be regulated is within the bounds of first amendment protection, not whether the speech provides the basis for an action in tort in a particular state. See generally New York Times Co. v. Sullivan, 376 U.S. 254, 283, 84 S.Ct. 710, 727, 11 L.Ed.2d 686 (1964) (a state cannot impose tort damages for speech protected by the Constitution). First amendment protection is national in scope and should not be made dependent on the vagaries of state tort law. Guideline E does not infringe on first amendment rights when analyzed in terms of constitutional law rather than Minnesota tort law.
 
 
 85
 The Supreme Court has yet to decide whether tort liability for truthful publication of private matters unrelated to public affairs is constitutionally permissible. Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 491, 95 S.Ct. 1029, 1044, 43 L.Ed.2d 328 (1975); Time, Inc. v. Hill, 385 U.S. 374, 383 n. 7, 87 S.Ct. 534, 539 n. 7, 17 L.Ed.2d 456 (1967). The Supreme Court has recognized, in a right to publicity context, that truthful publications by the news media may be without first amendment protection when overridden by a compelling state interest. Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562, 569-79, 97 S.Ct. 2849, 2854-59, 53 L.Ed.2d 965 (1977). "[T]ruth, itself, is no more dispositive in privacy cases than in any other speech setting[;] the focus of analysis ought to be whether the true statements or facts are entitled to protection under the first amendment." R. Bezanson, Public Disclosure as News: Injunctive Relief and Newsworthiness in Privacy Actions Involving the Press, 64 Iowa L.Rev. 1061, 1079 n. 68 (1979) (hereinafter Bezanson). Both the content and the context of the speech are critical elements of first amendment analysis.
 
 
 86
 [T]he character of every act depends upon the circumstances in which it is done. The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic. It does not even protect a man from an injunction against uttering words that may have all the effect of force. The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent.
 
 
 87
 Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919) (citations omitted); see also Blackwell v. Issaquena County Board of Education, 363 F.2d 749, 754 (5th Cir.1966). The content of the speech sought to be regulated by guideline E is speech that invades the privacy of others. In general, a person's right to be let alone is significant. Rowan v. Post Office Dept., 397 U.S. 728, 736-38, 90 S.Ct. 1484, 1490-91, 25 L.Ed.2d 736 (1970); Cox, 420 U.S. at 491, 95 S.Ct. at 1044. In particular, the state has a compelling interest in "safeguarding the physical and psychological well-being of a minor" by limiting even truthful disclosure of private facts. Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 607-09, 102 S.Ct. 2613, 2620-21, 73 L.Ed.2d 248 (1982) (footnote omitted). The state also has an interest "in teaching high school students how to conduct civil and effective public discourse...." Bethel School District No. 403 v. Fraser, --- U.S. ----, 106 S.Ct. 3159, 3168, 92 L.Ed.2d 549 (1986) (Brennan, J., concurring in the judgment). The speech regulated by guideline E is in the context of the schoolhouse. Although students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969), "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." Bethel School District No. 403, 106 S.Ct. at 3164. School officials may regulate language on school grounds which could not be controlled elsewhere. Id. at 3167 (Brennan, J., concurring in the judgment); see Thomas v. Board of Education, 607 F.2d 1043, 1052 (2d Cir.1979), cert. denied, 444 U.S. 1081, 100 S.Ct. 1034, 62 L.Ed.2d 765 (1980). Thus, even if invasions of privacy could not be regulated consistent with the first amendment in other contexts (a matter yet to be determined by the Supreme Court), the unique setting of the schoolhouse and the weight of the interests at stake warrant regulation in this case. Accordingly, absent Kuhlmeier, I would hold that a school official may prohibit the distribution of materials on school grounds which invades the privacy of others in intimate matters not the subject of public concern.[3] See Virgil v. Time, Inc., 527 F.2d 1122, 1128 (9th Cir.1975) ("[U]nless it be privileged as newsworthy ... the publicizing of private facts is not protected by the First Amendment."), cert. denied, 425 U.S. 998, 96 S.Ct. 2215, 48 L.Ed.2d 823 (1976).
 
 
 88
 McMILLIAN, Circuit Judge, concurring in part and dissenting in part.
 
 
 89
 For the reasons discussed below, I concur in part and dissent in part.
 
 
 90
 First, I want to explain my view of the meaning of the phrase "invasion of the rights of others." As was noted in Eisner v. Stamford Board of Education, 440 F.2d 803, 808 (2d Cir.1971), citing Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 513, 89 S.Ct. 733, 740, 21 L.Ed.2d 731 (1969) (Tinker ), "[t]he phrase 'invasion of the rights of others' is not a model of clarity or preciseness." I agree that affirmance of the district court's invalidation of Guideline E is mandated by this court's decision in Kuhlmeier v. Hazelwood School District, 795 F.2d 1368 (8th Cir.1986) (Kuhlmeier ) (tort liability for the school), cert. granted, --- U.S. ----, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987). Majority op. at 753-754; id. at 758 (Henley, J., concurring). But for Kuhlmeier, however, I would follow Judge Mansfield's interpretation of the Tinker "invasion of the rights of others" test. See Trachtman v. Anker, 563 F.2d 512, 521 (2d Cir.1977) (Mansfield, J., dissenting), cert. denied, 435 U.S. 925, 98 S.Ct. 1491, 55 L.Ed.2d 519 (1978). Judge Mansfield would not extend Tinker to "psychological" harm because
 
 
 91
 ["pyschological" harm] represents an entirely too vague and nebulous extension of the concept of "rights" to support the drastic type of censorship and prior restraint sought by the [school authorities].
 
 
 92
 ... The Tinker test makes sense as a standard designed to insure that school officials will be permitted, even at the expense of some freedom of expression, to maintain order on the school premises, particularly in the classroom.... Where physical disruption or violence is threatened, some inroads on free expression are tolerable because the interests of students and school officials are relatively specific and lend themselves to concrete evaluation.... A public school's premises are the very "marketplace of ideas" where personal intercommunication between students, in or out of the classroom, is "an important part of the educational process," even though some students may experience a degree of mental trauma in that process.... The possibilities for harmful censorship under the guise of "protecting" the rights of students against emotional strain are sufficiently numerous to be frightening.
 
 
 93
 Id. (citations omitted).
 
 
 94
 In addition, I believe that the facts in this case are distinguishable from those present in Kuhlmeier. The court in Kuhlmeier was concerned about the school's interest in protecting itself from tort liability for invasion of privacy because of certain articles scheduled to appear in the school newspaper. The school newspaper at issue was the official school newspaper, produced by students in the school's journalism class, during school hours, under the supervision of faculty advisors. The school also had an interest in avoiding the impression that it had authorized a specific expression contained in an official, school-sponsored student newspaper. However, Tour de Farce is an "underground" student newspaper. Like the Spectrum, the school newspaper in Kuhlmeier, Tour de Farce is produced by students, but it is not sponsored by or associated in any way with the school itself. In fact, much of its appeal is no doubt due precisely to its "underground" character. Under these circumstances, distribution of an underground student newspaper such as Tour de Farce would not result in tort liability for the school.
 
 
 95
 Next, I agree that prior restraints are not per se unconstitutional in schools or even in the adult world. See Near v. Minnesota, 283 U.S. 697, 713-16, 51 S.Ct. 625, 630-31, 75 L.Ed. 1357 (1931) (noting that "exceptional cases" would justify "previous restraint"). However, in the non-school setting, that is, in the non-prison, non-soldier, adult world, there is in fact only "a single, extremely narrow class of cases in which the First Amendment's ban on prior judicial restraint may be overridden ... [and that is] when the Nation 'is at war' during which times '[n]o one would question but that a government might prevent actual obstruction to its recruiting service or the publication of the sailing dates of transports or the number and location of troops.' " New York Times Co. v. United States, 403 U.S. 713, 726, 91 S.Ct. 2140, 2147, 29 L.Ed.2d 822 (1971) (Brennan, J., concurring), citing Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919), and Near v. Minnesota, 283 U.S. at 716, 51 S.Ct. at 631. Thus, prior restraints clearly represent a truly "exceptional" exception in first amendment analysis.
 
 
 96
 This court in Kuhlmeier "rejected the view that prior restraints are per se unconstitutional in the high-school context." Majority op. at 750, citing 795 F.2d at 1374 n. 5. The Kuhlmeier court stated that "Tinker standards are to be applied whenever [school] administrators can reasonably predict that the content of a student publication will violate the Tinker standard." 795 F.2d at 1374 n. 5 (citing several cases including Eisner ). However, in my opinion, Kuhlmeier does not address, and thus cannot be read to authorize, the kind of comprehensive system of prior review and approval established by the guidelines at issue here. Judicial approval of the kind of editorial control that the school authorities sought to exercise over the content of the official school newspaper in Kuhlmeier is simply not an issue in the present case. In fact, definition No. 5 of " 'unofficial' written material" specifically excludes "school newspapers, literary magazines, year books, and other publications funded and/or sponsored or authorized by the school." The guidelines at issue here require the submission for prior approval of all unofficial written material. I would hold that the guidelines' requirement that students submit "unofficial written material" to school authorities for prior review and approval violates the first amendment.
 
 
 97
 Most courts have followed Eisner's interpretation of Tinker and have upheld, at least in theory and with considerable restrictions, the power of school authorities to constitutionally exercise "prior restraint" and to require students to submit materials to school authorities for "screening" prior to distribution on school premises. 440 F.2d at 807; see, e.g., Thomas v. Board of Education, 607 F.2d 1043, 1049-50 (2d Cir.1979), cert. denied, 444 U.S. 1081, 100 S.Ct. 1034, 62 L.Ed.2d 765 (1980); Baughman v. Freienmuth, 478 F.2d 1345, 1349 (4th Cir.1973); Shanley v. Northeast Independent School District, 462 F.2d 960, 969 (5th Cir.1972); Quarterman v. Byrd, 453 F.2d 54, 58 (4th Cir.1971). However, I would follow the analysis set forth in Fujishima v. Board of Education, 460 F.2d 1355, 1358 (7th Cir.1972) (Fujishima ), that Tinker does not authorize prior restraint in the schools. As explained in Fujishima, Tinker authorizes school authorities to stop students from engaging in conduct protected by the first amendment, and to punish them for engaging in that conduct, if school authorities can reasonably forecast that "existing conduct, such as the wearing of [black] armbands if allowed to continue will probably interfere with school discipline." Id., citing Tinker, 393 U.S. at 514, 89 S.Ct. at 740.
 
 
 98
 Tinker in no way suggests that students may be required to announce their intentions of engaging in certain conduct beforehand so school authorities may decide whether to prohibit the conduct....
 
 
 99
 ....
 
 
 100
 The Tinker forecast rule is properly a formula for determining when the requirements of school discipline justify the punishment of students for exercise of their First-Amendment rights. It is not a basis for establishing a system of censorship and licensing designed to prevent the exercise of First-Amendment rights.
 
 
 101
 Fujishima, 460 F.2d at 1358 (emphasis in original); cf. Bethel School District No. 403 v. Fraser, --- U.S. ----, 106 S.Ct. 3159, 3166, 92 L.Ed.2d 549 (1986) (student suspended for giving "offensively lewd and indecent" speech at student assembly; proof of disruption; discipline held constitutional); Scoville v. Board of Education, 425 F.2d 10, 13-14 (7th Cir.) (students expelled for distributing underground newspaper in school; discipline held unconstitutional because, per Tinker, no proof that school authorities had reasonably forecast substantial disruption of school activity), cert. denied, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970). See also Prior Restraints in Public High Schools, 82 Yale L.J. 1325 (1973).
 
 
 102
 Even assuming that school authorities can constitutionally require students to submit all unofficial written material for approval by school authorities prior to distribution on school premises, I would argue that prior restraint regulations must be much more precisely drafted than rules imposing only disciplinary sanctions for distribution of material subject to censorship by school authorities. See Jacobs v. Board of School Commissioners, 490 F.2d 601, 605-10 (7th Cir.1973), vacated as moot, 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975); Baughman v. Freienmuth, 478 F.2d at 1349-50. Even though the guidelines impose no sanctions for noncompliance with the prior approval system (subsection II, Procedures ), the mere existence of the prior approval system has a chilling effect on students' exercise of their first amendment rights and warrant particularly careful scrutiny for vagueness and overbreadth. Further, even though violation of the guidelines does not subject any student to criminal sanctions, students who violate the substantive guidelines are nonetheless subject to school disciplinary action such as suspension or expulsion, and for that reason as well the guidelines warrant careful scrutiny for vagueness. See Guidelines, subsection V, Disciplinary Action (distribution in violation of subsections I and III is subject to disciplinary action; the prior approval system is contained in subsection II, Procedures ).
 
 
 103
 The geographic scope of the guidelines is properly limited to school premises only. Majority op. at 750; see Thomas v. Board of Education, 607 F.2d at 1050-51 (school regulation of off-campus publication and distribution of student newspaper held unconstitutional). In addition, this appeal raises these guidelines in the context of secondary school students only. Majority op. at 750.
 
 
 104
 I agree that the terms "obscene to minors" as used in guideline A and "libelous" as used in guideline B and as further defined in the guidelines and as interpreted by the court are not unconstitutionally vague or overbroad. Majority op. at 751-52. I also agree that the term "pervasively indecent or [pervasively] vulgar" as used in guideline C is not unconstitutionally vague or overbroad in the school context. Majority op. at 752-53; see Bethel School District No. 403 v. Fraser, 106 S.Ct. at 3165 (vulgar, offensive, lewd, indecent but not obscene speech); Board of Education v. Pico, 457 U.S. 853, 871-72, 102 S.Ct. 2799, 2810, 73 L.Ed.2d 435 (1982) (plurality opinion) (removal of "pervasively vulgar" books from school library); cf. FCC v. Pacifica Foundation, 438 U.S. 726, 746, 98 S.Ct. 3026, 3048, 57 L.Ed.2d 1073 (1978) (plurality opinion) (regulation prohibiting indecent or vulgar but not obscene language in radio broadcast). However, I would further qualify the prohibition against the distribution of "pervasively indecent or [pervasively] vulgar" material by also requiring proof that the distribution of such material caused, or was reasonably likely to cause, substantial disorder or material disruption of school activity. See Bethel School District No. 403 v. Fraser, 106 S.Ct. at 3168 (Brennan, J., concurring in the judgment); id. at 3168-69 (Marshall, J., dissenting); Tinker, 393 U.S. at 513, 89 S.Ct. at 740.
 
 
 105
 I agree that the phrase "advertises any product or service not permitted to minors by law" as used in guideline D is not in itself unconstitutionally vague or overbroad. Slip op. at 11. However, in the context of the prohibition against distribution to any student of "unofficial written material," the prohibition against "unofficial written material" which "advertises any product or service not permitted to minors by law" is overbroad. For example, taken literally, the guidelines would prohibit a student from "distributing" to another student virtually any magazine or newspaper because such "unofficial written material" invariably contains advertisements for products such as cigarettes and liquor, which are not legally available to minors.
 
 
 106
 I agree that the district court's invalidation of guideline E, which refers to expression which "invades the privacy of another person or endangers the health or safety of another person," must be upheld in light of Kuhlmeier. Majority op. at 753.
 
 
 107
 I also agree that guideline G itself is not vague or overbroad to the extent this guideline was intended merely to codify the holding in Tinker. Majority op. at 754. As noted by the court, the guidelines do require specific facts and objective evidence. However, I think that guideline G is overbroad because it refers to "material and substantial disruption" and, in my view, the definition of "material and substantial disruption" is vague and overbroad. For example, in definition 3(a), in the classroom or any other compulsory "educational program," "any disruption" which "interferes with or impedes the implementation of that program" is considered "material and substantial disruption." Under what circumstances can it be said that the educational program has been "impeded" or "interfered with"? Similarly, the definition of "material and substantial disruption" of voluntary school activities includes, in addition to student rioting and widespread shouting "inappropriate to the event," "participation in a school boycott, demonstration, sit-in, stand-in, walk-out, or other related forms of activity." Student rioting and widespread shouting "inappropriate to the event" (i.e., not at school athletic events, school plays or concerts), at any time, would obviously cause substantial disorder and material disruption of classes. However, what about a leaflet urging students to "stand-in" by lining the corridors, without blocking entrances or exits or stairways, before class, to protest some "current event"?
 
 
 108
 In addition, I think the definition in the guidelines of " 'unofficial' written material" is overbroad. It includes "all written material except school newspapers, literary magazines, year books, and other publications funded and/or sponsored by the school." As set forth in the definition, examples of " 'unofficial' written material" include "leaflets, brochures, flyers, petitions, placards, and underground newspapers, whether written by students or others." The guidelines also apply to "petitions, buttons, badges, or other insignia." Thus, under the guidelines, students are presumptively prohibited from distributing on school premises, without prior submission to and prior approval by school authorities, written materials as diverse as a student note, a Bruce Springsteen button, the Constitution, SPORTS ILLUSTRATED magazine, the New York Times, and the Bible. See Shanley v. Northeast Independent School District, 462 F.2d at 977; Eisner, 440 F.2d at 811.
 
 
 109
 I also think the definition of "distribution" is unconstitutionally vague. Under the guidelines, "distribution," which also includes "displaying written material in areas of the school which are generally frequented by students," is not limited to "a substantial distribution of written material, so that it can reasonably be anticipated that in a significant number of instances there would be a likelihood that the distribution would disrupt school operations." Eisner, 440 F.2d at 811. See also Shanley v. Northeast Independent School District, 462 F.2d at 977.
 
 
 110
 Finally, with respect to the Procedures section of the guidelines, in my opinion, school authorities cannot constitutionally require as part of the prior approval system that "anyone wishing to distribute unofficial written material" provide his or her name and phone number. "[W]ithout anonymity, fear of reprisal may deter peaceful discussion of controversial but important school rules and policies [and other subjects]." Jacobs v. Board of School Commissioners, 490 F.2d at 607, citing Talley v. California, 362 U.S. 60, 63-65, 80 S.Ct. 536, 538-39, 4 L.Ed.2d 559 (1960) (invalidating city ordinance prohibiting distribution of handbills unless handbills disclosed names and addresses of persons who printed, wrote, manufactured, and distributed them); Baughman v. Freienmuth, 478 F.2d at 1348 (pamphleteering), citing Organization for a Better Austin v. Keefe, 402 U.S. 415, 419, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1 (1971).
 
 
 111
 School authorities can constitutionally regulate the first amendment rights of non-university students only in those special circumstances where they can reasonably forecast substantial disruption of or material interference with school activities because of the students' exercise of their protected rights. The variety of protected student conduct and speech that school authorities have sought to regulate, from armbands to underground newspapers, forcefully reminds us that the courts must vigilantly protect the first amendment rights of students to challenge authority, to question social values, to criticize and disagree, to attack the status quo, and, most fundamentally, to express themselves freely and vigorously, even if such expression does not reflect the level of civil discourse that we would prefer.
 
 
 
 [1]
 A sample of this paper is in the record. Joint Appendix (J.A.) 10-16. Defendants attached another issue of the paper as an exhibit to their Reply Brief, and plaintiffs (appellees in this Court) moved to strike it as not part of the record before the District Court. The questions before us relate to the validity of defendants' policy on its face. They do not directly concern the propriety of discipline imposed for distributing any particular issue of the paper. To the extent that the nature of plaintiffs' desired publication is relevant in this context, we have a sample that is concededly properly before us. We have therefore not considered the issue of the paper attached to the Reply Brief, and the motion to strike is denied as moot
 
 
 [2]
 These rules are in the record at J.A. 24-29, and are set out in full in the Appendix to this opinion
 
 
 [3]
 Guideline C does forbid writings containing "any indecent or vulgar language," J.A. 24, in elementary schools, as opposed to the less stringent proscription, in secondary schools, of "expression which ... is pervasively indecent or vulgar." But no issue regarding elementary schools is before us in this case
 
 
 [4]
 We note, in fairness to plaintiffs, that the Minnesota Coalition Against Censorship's preference is that schools not prohibit expression even if it is "obscene as to minors." J.A. 35. The MCAC goes on, however, to recommend a definition of this phrase for schools that do decide to adopt a policy prohibiting such expression
 
 
 [5]
 See Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971)
 
 
 [1]
 I find the authority cited for this proposition, a law review comment, unpersuasive. Comment, Administrative Regulation of the High School Press, 83 Mich.L.Rev. 625, 640-41 (1984). The author divines that the primary function of the school's limited right to restrain student speech when the speech invades the rights of others is to "allow[ ] the school to protect itself from tort liability...." Id. at 641. I disagree. Guideline E prohibits forms of expression which "invade[ ] the privacy of another person or endanger[ ] the health or safety of another person...." This guideline appears more concerned with protecting the well-being of the students than avoiding tort liability. See Williams v. Spencer, 622 F.2d 1200, 1205-06 (4th Cir.1980) (principal may ban the distribution of a school newspaper which contained an advertisement promoting the sale of drug paraphernalia because it encourages action--drug use--that endangers the health or safety of students); Frasca v. Andrews, 463 F.Supp. 1043, 1052 (E.D.N.Y.1979) (in which the district court upheld the prior restraint of a school newspaper which contained a letter which the school principal considered libelous and likely to cause irreparable harm to the student who was the subject of the letter)
 
 
 [2]
 In both Hendry and House the Minnesota appellate courts, while not adopting the tort, go on to discuss why the plaintiffs' actions would fail even if the tort were recognized. Thus, it seems not unlikely that Minnesota may adopt the tort when the proper case arises. See Comment, Tortious Invasion of Privacy: Minnesota as a Model, 4 Wm. Mitchell L. Rev. 163, 177-82 (1978). This situation may place the school in a quandary as recognized by the dissent in Kuhlmeier, 795 F.2d at 1378-79 (Wollman, Circuit Judge, dissenting)
 
 
 [3]
 For example, disclosure that a particular person had undergone psychological treatment or treatment for drug abuse could be prohibited consistent with the Constitution. See Bezanson, supra at 1081-82. Conversely, discussions of these subjects that do not impinge on the privacy of others in some instances may not be circumscribed. See Kuhlmeier, 795 F.2d at 1376; see also Board of Education v. Pico, 457 U.S. 853, 868-72, 102 S.Ct. 2799, 2808-10, 73 L.Ed.2d 435 (1982) (school board may not remove books from school library when motivated by an intent to deny access to ideas); Tinker, 393 U.S. at 513, 89 S.Ct. at 740 (school officials may not adopt a regulation prohibiting political speech anywhere on school property)